RAMCO INTERNATIONAL, INC., etc., et al., Plaintiffs,

v.

TRAVEX CORPORATION, etc., et al., Defendants.

No. 80–6474–CIV–JAG.

United States District Court, S. D. Florida, N. D.

Feb. 11, 1982.

Margaret L. Cooper, Jones & Foster, West Palm Beach, Fla., for plaintiffs.

Phillip G. Boggs, Greenberg, Traurig, Hoffman, Lipoff, Quentel & Wolff, P.A., Miami, Fla., for Belcher Oil Co.

Gerald W. Moore, Taylor, Brion, Buker & Greene, Miami, Fla., for Eastern Airlines.

Bailey & Bailey, William G. Bailey, Houston, Tex., R. Bruce Wallace, Taylor, Brion, Buker & Greene, Miami, Fla., for Hydrocarbon Trading & Transport.

Bernard Berman, Fort Lauderdale, Fla., for Travex, Farmer and Gill.

## ORDER

GONZALEZ, District Judge.

THIS CAUSE is before the Court upon the respective defendants' Motions to Dismiss the Second Amended Complaint.

Plaintiffs' former complaint contained counts for specific performance, conversion, breach of contract, and to establish two constructive trusts.

Plaintiffs' Second Amended Complaint which adds three new defendants, is almost totally redrafted and contains eleven Counts: a Section 1 Sherman Act charge (Count I) against defendants Travex Corporation, Hydrocarbon, Belcher Oil Company, Donald Farmer and Ed Gill; a Section 2 Sherman Act charge (Count II) against the same parties; a constructive trust and/or detinue claim (Count III) against defendant Eastern Air Lines; a conversion claim (Count IV) against Eastern and Hydrocarbon; a willful conversion, embezzlement and theft claim (Count V) containing a prayer for punitive damages against Hydrocarbon, Travex, Farmer and Gill; a breach of warehouseman's duties and/or conversion claim (Count VI) against Belcher; a constructive trust and/or lien claim (Count VII) against Farmer, Gill, Omnico Corporation Metro Media, Inc., and Travex; a tortious breach of contract claim (Count VIII) containing a prayer for punitive damages against Travex, Farmer and Gill; a willful and malicious conversion claim (Count IX) containing a prayer for punitive damages against Travex, Farmer and Gill; a conversion claim (Count X) against Belcher; and a conspiracy and receipt of stolen property claim (Count XI) containing a prayer for punitive damages against Hydrocarbon, Farmer, Gill and Travex.

## I. BELCHER'S MOTION TO DISMISS

Belcher moves to dismiss Counts I and II for failure to state a claim under the feder-al anti-trust laws, Count IV for failure to state a claim for breach of warehouseman's duty, and Count X as surplusage. Belcher further moves to dismiss the entire complaint for lack of subject matter jurisdiction since if Counts I and II are dismissed, the Court will lack diversity jurisdiction over the remaining pendent claims, Eastern Air Lines and plaintiffs all being citizens of Delaware.

Travex, Farmer and Gill have all adopted Belcher's Motion to Dismiss the anti-trust counts.

### A.) THE ANTI–TRUST CLAIMS

Inasmuch as the conduct of Belcher, Travex, Hydrocarbon, Farmer and Gill [1] constituted the alleged anti-trust violations, the allegations in the complaint concerning those parties will be examined.

#### 1) Belcher-Travex

On April 21, 1980 Belcher, the owner of certain holding tanks for storage of aviation fuel in Port Everglades, entered into a terminaling contract with Travex, a buyer and seller of aviation fuel, whereby Travex was given the exclusive right to use Belcher's tank PM 10. (see Article II of the Belcher-Travex Terminaling Contract attached as Exhibit A to the second amended complaint). Travex then entered into a "filtration system use agreement" with Trans World Airlines, Inc. and a piping or "throughput agreement" with Standard Transpipe Corp. These contracts enabled Travex to pump their aviation fuel from the leased storage tank through the filtration system and pipes to various airline terminals in Miami and Fort Lauderdale.

#### 2) Travex-Ramco/Afex

Subsequently, Ramco/Afex, plaintiffs herein, for the express purpose of engaging in business as an "independent fuel supplier" [2], negotiated an agreement with Travex

---

1. Farmer and Gill are made parties to these Counts because of their relationship as agents and owners of Travex Corporation, and as such their actions are tantamount to that of the Corporation.

2. Independent fuel suppliers operate essentially by purchasing aviation fuel from the major oil companies, storing it and then selling the same to the airlines at a time when the supply of fuel

through a series of Telexes, whereby Ramco/Afex would be granted exclusive use of the subject storage tank and the piping rights obtained by Travex (hereinafter referred to as the sub-terminaling agreement).

In June, 1980 plaintiffs began operation under the sub-terminaling agreement by shipping 75,000 barrels of aviation fuel into the storage tank. Plaintiffs additionally made all the necessary payments to Travex through September, 1980 when their initial complaint was filed.

Travex, nevertheless, allegedly refused to execute a formal, long term contract encompassing the terms previously agreed on and contained in the various telexes. Instead Travex, in an attempt to preserve its access to the subject fuel storage facility, sought to execute an agreement with Ramco/Afex providing for a mutual, non-exclusive storage arrangement over the fuel tank. Ramco/Afex refused to accept these new terms, and hence a contract containing the sub-terminaling agreement was never formally executed by the parties.

Because of these disagreements Ramco/Afex was notified that it must remove its remaining fuel from the tank by the end of September, 1980. Ramco/Afex alleges that they were never notified of the existence of the Belcher-Travex terminaling contract, the same being discovered upon plaintiffs' contractual commitments with third parties to sell their fuel, which was temporarily stored in the tank pending consummation of plaintiffs' sale transaction(s).

### 3) Belcher-Travex-Ramco/Afex

In the meantime, on approximately August 6, 1980 plaintiffs discovered that Belcher pursuant to Travex's instructions had pumped 5,000 barrels of fuel from the tank over which plaintiffs asserted ownership[3]. As has been seen, plaintiffs continued to deal with Travex throughout this period since they had no other fuel storage facility, whereupon Belcher, upon being informed of Ramco's ownership of the fuel, immediately ceased further pumping, although pumping resumed thereafter.

On October 24, 1980 Travex and Belcher agreed that Belcher would hold back 5,000 barrels of fuel from any orders to move the same made by Ramco/Afex. Plaintiffs allege that Belcher's refusal to move this fuel resulted in plaintiffs' damages. These 5,000 gallons were, nevertheless, later removed and sold by plaintiffs.[4]

### 4) Hydrocarbon

Hydrocarbon enters the scene during the summer of 1980. At that time plaintiffs obtained their storage facility through Travex, Hydrocarbon also obtained local storage facilities in an attempt to enter the South Florida market as an independent fuel supplier.

When Travex and Ramco/Afex could not reach agreement over the terms of their sub-terminaling agreement, Travex turned to Hydrocarbon to negotiate its desired joint use arrangement concerning tank PM 10.

Plaintiffs allege that on August 6, 1980 they discovered an agreement between Hydrocarbon and Travex, whereby the former

---

from the major oil companies is insufficient to meet the airline's fuel demands.

**3.** Pursuant to the Belcher-Travex terminaling agreement, to wit Articles II, III & XVII, incorporating an exclusive use clause, Belcher would release the fuel contained in the tank *only* at Travex's request.

**4.** The record apart from the complaint reveals that on December 11, 1980 Belcher filed a Motion for Speedy Hearing and Declaratory Judgment concerning the rights and duties appurtenant to its storage tank PM 10. Belcher specifically sought guidance from the Court as to

which party was entitled to the remaining 5,000 barrels of fuel reserved in its tank inasmuch as various parties declared entitlement to the same. Travex asserted a lien over the fuel; Ramco/Afex claimed ownership over the same; Belcher claimed a lien on it to cover the unpaid charges for its storage. Pursuant to being advised that the 5,000 barrels in issue were removed or sold by the plaintiffs, this Court did not hold a speedy hearing at Belcher's request and further reserved consideration of Belcher's Motion for Declaratory Judgment until trial of this cause as a whole.

was to purchase fuel from Travex and resell it to Eastern Airlines, Inc. After notification by plaintiffs of their rights in the fuel, Travex, Hydrocarbon and Eastern consummated these fuel transactions notwithstanding assurances by Eastern and Hydrocarbon that payment to Travex would be withheld until Travex-Ramco/Afex sub-terminaling agreement dispute was resolved. Hydrocarbon induced Eastern to pay for the fuel by assuring Eastern it would be fully indemnified if any liability resulted from that transaction.

Hydrocarbon never obtained any rights in storage tank PM 10 under Travex, because while negotiations were continuing Belcher declared its terminaling agreement with Travex null and void.

Travex diverted the funds received from the alleged sale of plaintiffs' fuel by Hydrocarbon to its principals, Farmer and Gill, and also transferred funds to two newly formed corporations, Omnico and Metropolitan Media.

Although Ramco/Afex continued to deal with Travex after the alleged conversion of its fuel, it eventually chose to declare the entire sub-terminaling agreement with Travex null and void because of the continuing breaches of contract.

Finally, Belcher agreed to leave "additional" storage facilities to Hydrocarbon.[5]

These facts are all chronicled in the light most favorable to plaintiffs, taking all of the allegations of the Second Amended Complaint as true.

The conclusory averments of the second amended complaint indicate that the relevant market consisted of South Florida independent fuel suppliers, and that this market is a limited one containing few competitors. Nowhere do plaintiffs set forth the number of independent fuel suppliers actually conducting business in South Florida.

Plaintiffs further charge that Hydrocarbon knew that its competitor Ramco/Afex would be driven out of business if a dispute over the storage tank and fuel erupted protracted litigation. The Belcher-Hydrocarbon lease agreement gives Hydrocarbon free and unbridled access to the relevant South Florida marketplace to the exclusion of Ramco/Afex.

The allegations in the complaint as a whole are insufficient to sustain a Section 1 Sherman Act charge against Belcher.

### The Sherman Act—Section 1

Section 1 of the Sherman Act, 15 U.S.C. § 1, states in pertinent part that, "Every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several states . . . is hereby declared to be illegal." An irreducible minimum of two actors coordinating their efforts for the conscious attainment of a common, anti-competitive goal is necessary to trigger the applicability of Section 1. Several actors, who act unilaterally to achieve separate, independent objectives, do not subject themselves to the proscriptions contained within the antitrust laws.

Count I charges defendants with a combination or conspiracy to restrain free trade. Plaintiffs cite to the agreements described in the complaint (e.g. the Belcher-Travex terminaling contract, the Travex-Ramco/Afex sub-terminaling agreement, the Belcher-Travex hold back agreement and the Belcher-Hydrocarbon lease) as the source of the combination or conspiracy designed by Belcher, Travex, Farmer, Gill and Hydrocarbon to exclude plaintiffs from freely dealing in the relevant market. Plaintiffs' position is that the above agreements evidence defendants' "concerted" refusal to deal with them.

The Courts have consistently recognized three categories of refusals to deal: (1)

---

**5.** Plaintiffs' choice of the word "additional" appears to be particularly appropriate in light of Belcher's representations that their contract with Hydrocarbon involved a different, smaller fuel tank than PM 10. (See page 4 of Belcher's Motion to Dismiss). However, the issue of whether the tank leased to Hydrocarbon is the same as that previously leased to Travex is a factual issue inappropriate for resolution in the context of a Motion to Dismiss. Accordingly, this Court will treat the plaintiffs' allegations as true and proceed on the fact that the storage tanks in issue are the same.

unilateral refusals to deal, (2) vertical refusals to deal [6], and (3) horizontal refusals to deal.[7]

Categorization is important, because it affects the pleading requirements necessary to assert a cause of action under Section 1 of the Sherman Act.

The threshold issue is whether Belcher's conduct amounted to an actionable refusal to deal under the Sherman Act.

The second amended complaint indicates that Belcher entered into two agreements with plaintiffs' competitors, Travex and Hydrocarbon.[8]

■ A refusal to deal is not actionable under the Sherman Act unless the party refusing to deal does so by rejecting the same terms and conditions afforded to and tendered by other parties. In the case at bar Belcher did not refuse to deal with Ramco/Afex on the same terms and conditions extended to their competitors (Travex & Hydrocarbon).

■ The second amended complaint reveals that Belcher, at most, refused to honor Ramco/Afex's claim to its fuel tank through the sub-terminaling agreement to which Belcher was not a party and to which it did not consent.

Belcher's unwillingness to *indirectly* deal with independent fuel suppliers and its predisposition to deal only *directly* with those interested in bargaining for a terminaling facility is evidenced by the non-assignability clause at Article XVII in its terminaling contract (Exhibit A to the second amended complaint). It provides that Travex may not assign its contract to another without the prior written consent of Belcher thereby preserving to Belcher the right to approve the terms of said assignment in the same manner as it would if Belcher were contracting directly.

The second amended complaint does not allege that Ramco/Afex directly approached Belcher with an offer to negotiate a storage lease as did their counterparts Travex & Hydrocarbon. Instead Ramco/Afex attempted to negotiate a subordinate agreement with Travex, Belcher's lessee. Plaintiffs' failure to allege circumstances wherein Belcher refused to deal with plaintiffs in the same way it dealt and bargained with their competitors presents a fatal flaw in pleading in that an essential element of a Section 1 claim is missing, namely, legal refusal to deal as evidenced by the relevant agreements.

Furthermore, the anti-trust laws proscribe *refusals* to deal, not bilateral *failures* to deal resulting from the actions of both the charging party (Ramco/Afex) and the charged party (Belcher). Even though Belcher and Ramco/Afex did not enter into a contractual arrangement (no lease agreement was directly proffered by either of the parties), nevertheless, Belcher did not evidence a *legal* refusal to deal under Section 1.

The second element of a Section 1 claim is also absent from the complaint, namely, that there was a combination or conspiracy flowing from a pattern of concerted efforts consciously pursued to attain a trade restraint (lessening competition by excluding a competitor from the market).

**6.** These are express agreements between businesses in successive tiers of the distributive chain not to deal with others.

**7.** These are agreements entered among businesses within the same tier of the distributive level, namely competitors, not to deal with others in the same or different tiers.

**8.** Belcher's hold back agreement with Travex pertaining to the 5,000 barrels of fuel stored in tank PM 10 does not have anti-trust significance, since it was not executed to promote anti-competitive purposes. The record establishes that the hold back agreement served to preserve the fuel in the tank pending the resolution of the parties' (Belcher, Travex & Ramco/Afex) conflicting claims over the same. (see footnote 4, *supra*.) Also, Belcher's termination of its terminaling contract with Travex cannot be the source of an anti-trust claim by plaintiffs, since the law clearly grants a contractual party the option of terminating its contract upon breach by the other party. Ramco/Afex does not purport to be a third party beneficiary of the terminaling contract. To the contrary, their allegations, taken as true, establish that Travex breached its terminaling contract with Belcher as well as its subterminaling agreement with plaintiffs.

The Colgate Doctrine first announced in *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), although refined by subsequent decisions,[9] fully protects behavior that amounts to a legal refusal to deal where the same is characterized as unilateral. The reason is that unilateral refusals to deal lack the required elements of plurality and concerted action necessary to support the elements of a Section 1 combination or conspiracy.

In the absence of express or implied agreements between the manufacturer and the wholesalers or retailers, the *Colgate* court concluded that the defendant acted with its customers individually, thereby precluding a finding that there was a combination or conspiracy. *Colgate* heralded the proposition that a private trader or manufacturer is free to exercise its own, independent discretion concerning those with whom it will deal for reasons sufficient to itself.

The Supreme Court in an opinion characterized as the "Colgate plus" Doctrine[10], *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), condoned an announcement to the trade of a policy followed by a refusal to deal with those who will not observe it. That court, however also held that more extensive conduct employing coercive devices beyond mere customer selection for the purposes of marshaling acquiescence in its announced policy falls outside the *Colgate* immunity and supplies the requisite element of a "combination or conspiracy" contained in the language of Section 1.

Belcher's conduct herein merely demonstrates a policy of not dealing with parties seeking to enforce rights assigned under the terminaling contract without its prior consent. This simple refusal to deal with plaintiffs does not exceed the limits of *Parke, Davis*, there being no express or implied agreement, or coerced acquiescence by Belcher with third parties to exclude plaintiffs from the relevant market.

The same is true of the Belcher-Hydrocarbon lease. Again, plaintiffs have not alleged that they sought to secure a lease by directly dealing with Belcher. The complaint does allege that Hydrocarbon entered into *direct* dealings with Belcher and did not seek to secure rights through any assignment from a third party. At most the plaintiffs have pled a failure to deal situation attributable to the actions of both Belcher and Ramco/Afex. In the absence of a legal refusal to deal, plaintiffs cannot sustain their Section 1 claim.

9. A sampling of the decisions limiting the *Colgate* Doctrine are as follows: *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (refusal to deal coupled with the hiring of a third party to solicit customers away from party refusing to adhere to Defendant's maximum pricing policy); *Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964) (defendant's threat of non-renewal, an affirmative action beyond a mere announcement of policy coupled with refusal to deal, amounted to a coercive device perpetrated upon its retail outlets to effect minimum price control); *FTC v. Beech-Nut Packing Co.*, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922) (announced resale pricing policy accompanied by threats of termination, vigorous surveillance of prices and conditional reinstatement programs went far beyond the simple refusal to deal with those not selling at stated prices). This line of jurisprudence narrowing the *Colgate* immunity was designed to catch situations in which there are coercive tactics to secure customer acquiescence going affirmatively beyond a passive refusal to deal with those not conforming to announced policy, e.g. enlistment of third parties to effectuate a policy and solicitation of assurances of future compliance resulting in retrieval of such assurances. 2 Von Kalinowski, Anti-Trust Laws and Trade Regulation § 6C.02[1]. Inasmuch as a combination or conspiracy can be achieved by passive acquiescence, *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944), the element of coercion causes passive acquiescence which in turn supplies the necessary element of duplicity (concerted action) essential for a combination or conspiracy. *Yentsch v. Texaco, Inc.* 630 F.2d 46, 52 (2d Cir. 1980).

10. In *Colgate* an express or implied agreement was essential to establish a combination. As foreshadowed by the *Bausch & Lomb* opinion, the *Parke, Davis* Court held that in addition to an express or implied agreement a combination is created between a producer and the target parties when the former employs coercive conduct culminating in acquiescence by the latter. *Parke, Davis, infra,* (defendant enforced resale price schedule by threatening to terminate insurgent wholesalers and retailers).

Furthermore, the elements of concerted action and plurality, necessary to constitute a combination of conspiracy, are missing. Pursuant to the *Colgate* and *Parke, Davis* opinions Belcher's refusal to deal except on its announced terms is permissible conduct.

The Fifth Circuit has followed the Supreme Court's lead in finding that not all conduct, which facially appears to be applicable to the broad language of Section 1, will be construed as actionable in the absence of affirmative, coercive action by the charged party. *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107 (5th Cir. 1979). The Court therein adopted the language of the Ninth Circuit in stating:

> We think it undisputable that a single manufacturer or seller can ordinarily stop doing business with A and transfer his business to B ... And the decisions cited [above] make it clear that the decision of the seller to transfer his business from A to B is valid even though B may have solicitated the transfer and even though the seller and B may have agreed before the seller terminates his dealings with A. *Id.* at 1114–1115.

In *Aladdin* Service Oil, a Texaco distributor was going out of business. Plaintiff, a distributor of gas at wholesale and retail levels, proposed to buy Service Oil pending Texaco's waiver of its purchase option over the same. Defendant-Texaco exercised its purchase option over Service Oil, vetoed plaintiff's proposal to buy the same and then assigned its purchase option to co-defendant, Poweram, a horizontal competitor of plaintiff. Poweram subsequently purchased Service Oil. The proposition espoused in *Aladdin* equally applies herein, to wit termination of a customer (Travex) followed by the choice of one replacement lessee (Hydrocarbon) over another (Ramco/Afex) based upon legitimate reasons. This is not a Sherman Act violation and at most is a unilateral refusal to deal. See also, *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245 (5th Cir. 1975).

Plaintiffs' also charge Travex and Hydrocarbon with entering into a combination or conspiracy in restraint of trade. The agreements between the parties are the alleged source of the combination or conspiracy which allegedly result in the anti-competitive exclusion of Ramco/Afex from the relevant market.[11]

Plaintiffs allege that Travex, while initially agreeing to an exclusive use arrangement under the Telexed, sub-terminaling contract thereafter became dissatisfied with its terms. Travex then sought to preserve its access to the storage tank by renegotiating for a non-exclusive joint use plan. Plaintiffs were unwilling to agree to this new proposal. Travex then turned to Hydrocarbon in an attempt to arrive at a mutual use agreement covering tank PM 10. This bargaining never resulted in a legally binding agreement since both Belcher and Ramco/Afex terminated their respective terminaling contract and sub-terminaling agreements.

The gravamen of plaintiffs' complaint is that Ramco/Afex lost some of its fuel and use of the fuel storage tank as the result of the actions of the defendants. These claims arise out of the alleged breach of the sub-terminaling agreement and the subsequent conversion(s). At best, plaintiffs have alleged claims in contract and tort. *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 274 (5th Cir. 1979). See also, *Hawaii v. Standard Oil Company*, 405 U.S. 251, 262 n. 14, 92 S.Ct. 885, 891 n. 14, 31 L.Ed.2d 184 (1972) (Congress did not intend the anti-trust laws to provide a remedy in damages for all injuries conceivably traced to anti-trust violations); *Hunt v. Crumboch*, 325 U.S. 821, 826, 65 S.Ct. 1545, 1548, 89 L.Ed. 1954 (1945) (Sherman Act does not

11. The Belcher-Travex terminaling contract and the Belcher-Hydrocarbon lease agreement do not amount to the source of a Section 1 combination or conspiracy as analyzed above. Since plaintiffs have failed to allege circumstances supporting that Belcher's actions were "concerted" as opposed to "unilateral", these agreements cannot form the basis of a combination or conspiracy between Travex and Hydrocarbon. There was no agreement between the latter two nor any coercive conduct evinced by the same. Instead, these agreements evidence independent, business decisions by each to deal *directly* with Belcher, not each other.

purport to afford remedies for all torts committed by or against persons engaged in interstate commerce). Plaintiffs' inability to lease one tank does not present an anticompetitive effect covered by the Sherman Act. *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

This court is mindful of the general policy against granting Motions to Dismiss in anti-trust cases; however, the time, expense and complexity surrounding this type of litigation demands intense judicial scrutiny of the pleadings to make certain they allege a Section 1 claim. *Scranton Const. Co., Inc. v. Litton Industries Lease Corp.*, 494 F.2d 778, 783 (5th Cir. 1974) (the Sherman Act is neither a lowest responsible bidder statute nor a panacea for all business affronts which seem to fit nowhere else).

Inasmuch as the acts of Farmer and Gill are essentially the same as those of Travex (see footnote 1, *supra*), plaintiffs' anti-trust claim against them must fail for the same reasons the claim against Travex must fail.

### The Sherman Act—Section 2

■ Plaintiffs' allegations in support of their Section 2 claim are in effect restatements of the Section 1 restraint of trade claims already analyzed and rejected. While Section 2 is intended to capture violations which escape Section 1 proscriptions, *Lorain Journal Co. v. United States*, 342 U.S. 143, 153, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951), nevertheless, where the restraint of trade claim is deficient it cannot be utilized to support a Section 2 claim. *Mogul v. General Motors Corporation*, 391 F.Supp. 1305, 1314 (E.D.Pa.1975), *aff'd*, 527 F.2d 645 (3d Cir. 1976).

Section 2 of the Sherman Act, 15 U.S.C. § 2, states in relevant part that, "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be punished...."

The only claim asserted against Belcher is that of conspiracy to monopolize, not attempt to monopolize. Paragraph 59 of the second amended complaint alleges that, "As a result of the actions of Travex, Hydrocarbon, Farmer and Gill, there is a dangerous probability of monopolization of the aviation fuel market and terminal business in South Florida ...." Belcher is conspicuously missing from this allegation.

■ The vital components of a conspiracy to monopolize claim are: (1) existence of conspiracy, (2) overt acts in furtherance thereof, (3) a substantial amount of commerce, and (4) a specific intent to monopolize. 3 Von Kalinowski, Antitrust Laws and Trade Regulation § 701[1]. The gravamen of the Section 2 claim for conspiracy to monopolize is the unsuccessful, *concerted* action to achieve monopoly power. *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Nelson Radio & Supply Co. v. Motorola*, 200 F.2d 911 (5th Cir. 1952).

■ The Section 1 portion of this opinion has demonstrated the failure of plaintiffs to plead even generally the requisite element of concerted action (interdependent, consciously parallel actions). It follows, therefore, that the Section 2 conspiracy claim against Belcher as well as the remaining defendants must be dismissed.

The remaining claim contained in Count II charges Travex (Farmer and Gill as agents and owners thereof) and Hydrocarbon with an "attempt to monopolize".

The elements constituting an attempt to monopolize are: (1) specific intent by the prospective monopolist to achieve unlawful monopoly power, coupled with (2) a dangerous probability of monopoly in the relevant market. The plaintiffs have defined the relevant market as the independent fuel supply business in South Florida.

The element of dangerous probability has been described as, "the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it." *American Tobacco*, 328 U.S. at 785, 66 S.Ct. at 1127 (approving trial Court's jury instructions defining the

phrase, "attempt to monopolize"). *Centanni v. T. Smith & Son, Inc.*, 216 F.Supp. 330, 339 (E.D.La.1963), *aff'd per curiam*, 323 F.2d 363 (5th Cir. 1963).

Although actual monopolization is not a required element in an attempt case where Defendant(s)' individual or concerted methods, means and practices were unsuccessful, the element of "dangerous probability" is crucial to sustain the claim. It is inconceivable and contrary to reason and common sense that the failure of Ramco/Afex to secure a single fuel storage tank with a capacity of 95,000 barrels could create a dangerous probability of monopolization in the independent fuel supply business in South Florida. It is not alleged anywhere in the complaint that PM 10 is the only storage tank available in the South Florida market, that plaintiffs were effectively precluded from obtaining either a substitute tank from other terminaling lessors, or that they were prevented from securing a different tank from Belcher by directly dealing with Belcher.[12]

Although plaintiffs are not required to proffer full proof of their claim in the initial pleading, a general description of the facts and circumstances supporting said claim is necessary in order to insure that anti-trust causes of action are not indiscriminately tacked onto pending state claims for contractual or tortious relief.

Assuming the truthfulness of plaintiffs' allegations, including the charge that they have been put out of business in the relevant market, such a result was not the product of Section 2 infractions. The second amended complaint fails to meet the *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) standard for withstanding a Motion to Dismiss on the pleadings, and as such must be dismissed.

Upon dismissal of Counts I and II, the remaining jurisdictional predicate is that of diversity of citizenship pursuant to 28 U.S.C. § 1332. A review of the complaint indicates that the plaintiffs and the defendant, Eastern Airlines, Inc., all share their situs of citizenship in Delaware thereby destroying complete diversity between the adverse parties in this cause.

Based on the foregoing, it is ORDERED AND ADJUDGED as follows:

1) That Defendants, Belcher, Travex, Farmer and Gill's Motions to Dismiss Counts I and II from the Second amended complaint be, and the same is hereby GRANTED.

2) That the Defendants' Motions to Dismiss the entire second amended complaint for lack of subject matter jurisdiction be, and the same is hereby GRANTED.

3) The remaining Motions to Dismiss the state claims filed by Eastern Airlines, Inc., Belcher Oil Company, Travex Corporation, Metropolitan Media, Inc., Omnico Corporation, Donald Farmer and Ed Gill be, and the same are hereby DENIED AS MOOT by virtue of paragraphs one (1) and two (2) of this Order.

---

**12.** Regarding the first prong of the "dangerous probability" test articulated in *American Tobacco* and reiterated in *Centanni*, the facts as alleged in the second amended complaint further indicate that the methods, means and practices employed by defendants to preclude Ramco/Afex from securing access to tank PM 10 were successful, and yet they failed to accomplish monopolization.