**BEN SHEFTALL DISTRIBUTING CO., INC., Plaintiff,**

v.

**MIRTA de PERALES, INC., Defendant.**

**No. CV–491–168.**

United States District Court, S.D. Georgia, Savannah Division.

April 29, 1992.

Leonard J. Panzitta, Savannah, Ga., for plaintiff.

Wilfredo A. Rodriguez, Miami, Fla., for defendant.

## ORDER and MEMORANDUM

NANGLE, Senior District Judge.

Plaintiff Ben Sheftall Distributing Co., Inc., brought this action arising under Section 1 of the Sherman Anti–Trust Act, 15 U.S.C. § 1, and Section 1 of the Robinson–Patman Act, amending Section 2 of the Clayton Antitrust Act, 15 U.S.C. § 13, seeking treble damages, injunctive relief and attorney's fees under Sections 4, 12 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 22 and 26, and for compensatory and punitive, exemplary or vindictive damages

for tortious interference with contractual relations and unlawful restraint of trade under the laws of the State of Georgia. Defendant Mirta de Perales has filed a motion to dismiss plaintiff's complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. Based on the following analysis, the Court will dismiss plaintiff's antitrust claims, and, as a result, the state law claims as well.

FACTS

Plaintiff, a Georgia corporation, is a distributer of ethnic cosmetic and beauty supplies. Plaintiff obtains these products from various ethnic cosmetic and beauty supply manufacturers and suppliers and then distributes them to retailers throughout the nation at wholesale prices. Plaintiff's retail customers include national department and drug store chains, as well as regional and local retailers of ethnic cosmetic and beauty supplies. Plaintiff has been in this business since the seventies, and, for the calendar year ending in 1990, it achieved approximately $30 million in sales.

Plaintiff's problems arose when other distributors of ethnic cosmetic and beauty supplies became disgruntled with plaintiff's ability to undersell a certain line of such cosmetics and supplies. Particularly, this claim focuses on the Hispanic cosmetic and beauty supplies manufactured and supplied by defendant to independent distributors throughout the nation. These distributors, like plaintiff, resell defendant's products at wholesale prices to retailers, including national department and drug store chains as well as regional and local retailers of ethnic cosmetic and beauty supplies. Plaintiff in particular has been an independent distributor of defendant since the mid-eighties and has distributed the products to various retail outlets throughout the nation.

According to the complaint, soon after plaintiff's distributorship relationship with defendant began, several of defendant's other distributors began to complain. They informed defendant that the low prices that plaintiff charged its retail customers were affecting the market. Consequently, they requested that defendant enforce a resale price maintenance plan with its distributors in order to coerce the distributors into charging uniformly higher prices. Plaintiff alleges that, in violation of Section 1 of the Sherman Anti–Trust Act, defendant, "in cooperation and concert with several of these distributors, agreed to enforce a resale price maintenance plan and to coerce" plaintiff into compliance with the pricing policy.

In support of this conclusory allegation of conspiracy, plaintiff further alleges that, as part of the coercive effort to force plaintiff to adhere to the higher prices, defendant withdrew "certain" payment terms and discounts which were previously available to plaintiff. Meanwhile, those same payment terms and discounts remained available to other independent distributors. Then, when plaintiff still refused to increase its prices of defendant's products, plaintiff alleges that defendant terminated its distributorship and refused to sell any of its products to plaintiff. The reason given plaintiff for the termination was defendant's belief that plaintiff's pricing system was "indirectly affecting the market and the relations with our other distributors."

Despite the termination, plaintiff alleged that it tried to continue at least one of its retail customers, Eckerd, with a full line of ethnic cosmetic and beauty supplies, including defendant's products. In order to accomplish this feat, plaintiff purchased defendant's products from another one of defendant's independent distributors. Unfortunately for plaintiff, when defendant discovered that plaintiff was continuing to distribute its products to Eckerd, it encouraged Eckerd to discontinue its relationship with plaintiff and purchase the products from another independent distributor. Defendant informed Eckerd that plaintiff was no longer receiving its products and, instead, was distributing stale and damaged products to Eckerd. Plaintiff contends that as a result of this action by defendant, Eckerd ceased to use plaintiff as its distributor of Hispanic cosmetic and beauty supplies, including those supplies plaintiff received from manufacturers and suppliers other than defendant.

As a whole, plaintiff alleges that these actions by defendant, in concert with others, constitute a combination and conspiracy in restraint of trade in violation of Section 1 of the Sherman Anti–Trust Act. In addition, plaintiff alleges that by selling its Hispanic cosmetic and beauty supplies to plaintiff at different prices than the prices it sold goods of like grade and quality to plaintiff's competitors, defendant practiced illegal price discrimination in violation of Section 1 of the Robinson–Patman Act, amending Section 2 of the Clayton Antitrust Act. Plaintiff contends that the sales were made in interstate commerce and that the price discrimination may substantially lessen competition or injure, destroy or prevent competition with plaintiff's competitors.

As a final touch, plaintiff also alleges a cause of action under Georgia law for restraint of trade and a cause of action for interference with plaintiff's contractual relations and business expectations. Plaintiff alleges the same facts as those in its Sherman Act claim as a basis for its Georgia restraint of trade claim. Plaintiff's interference with its contractual relations claim is based on defendant's actions with respect to Eckerd.

Defendant, on the other hand, attacks each cause of action as failing to state a claim under Rule 12(b)(6). With regard to the Sherman Anti–Trust claim, defendant argues that plaintiff has failed to allege sufficient facts to show the existence of a "combination and conspiracy in restraint of trade" between defendant and its distributors. Instead of constituting a conspiracy, defendant suggests that its actions were clearly independent and unilateral and, as a result, do not violate the Sherman Anti–Trust Act. Defendant similarly argues that the other federal claim, that alleging price discrimination under the Clayton Antitrust Act, should be dismissed because plaintiff failed to show any antitrust injury, causation or damage to itself.

Defendant similarly finds fault with the pendent state law claims. It argues that Georgia law does not provide plaintiff with a cause of action for its particular restraint of trade claim. And, defendant believes that the cause of action for interference with plaintiff's contractual relations should be dismissed because plaintiff failed to allege any of the elements of that cause of action, especially the requirement that defendant maliciously intended to injure plaintiff.

## THE ANTITRUST CLAIMS

### I. *Standard for motions to dismiss antitrust actions*

Ordinarily, one would think that the standard to be used in evaluating a motion to dismiss an antitrust claim would be as complex as the action itself. Such is not the case. *See Bryant Heating & Air Conditioning Corp. v. Carrier Corp.*, 597 F.Supp. 1045 (S.D.Fla.1984) (the concept of notice pleading applies to the "big" antitrust case as well as the "small" negligence lawsuit); *Quinonez v. National Association of Securities Dealers*, 540 F.2d 824 (5th Cir.1976); *United States v. Southern Motor Carriers Rate Conference*, 439 F.Supp. 29 (N.D.Ga.1977). Antitrust actions, like all actions under today's liberal pleading rules, follow the venerable Supreme Court decision *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *Conley* established that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that a plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Id.* at 45–46, 78 S.Ct. at 101–102.

In evaluating the motion to dismiss, the Court must accept the well pleaded facts as true and resolve them in the light most favorable to the plaintiff. *Id.* The complaint will be deemed sufficient if the facts state a claim under any conceivable legal theory. *Bryant*, 597 F.Supp. at 1049. As long as, in the end, the pleadings give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests, the theory of notice pleading is satisfied. *Conley*, 355 U.S. at 47, 78 S.Ct. at 102; *City of Gainesville v. Florida Power & Light Co.*, 488 F.Supp. 1258 (S.D.Fla. 1980).

Moreover, the Court is mindful that in antitrust actions, where the proof is largely in the hands of the alleged conspirators, summary dismissals prior to allowing the plaintiff ample opportunity for discovery should be granted even more sparingly. *Southern Motor*, 439 F.Supp. at 38. Nevertheless, even though a plaintiff may be unable to allege specific facts which would prove actual acts of agreement or conspiracy, the plaintiff must set forth facts from which an inference of unlawful agreement can be drawn. *Brett v. First Federal Savings & Loan Ass'n*, 461 F.2d 1155 (5th Cir.1972). This requirement simply follows from the basic tenet of notice pleading—the "short" statement of the pleader's claim must also be "plain" and it must show that the pleader is entitled to relief. The pleading must contain either direct allegations on every material point necessary to sustain a recovery on any legal theory, even though it may not be the theory suggested or intended by the pleader, or allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial. Thus, even though what needs to be pleaded to satisfy this requirement will vary with the nature of the action, the relief sought, and the respective positions of the parties in terms of the availability of information, a conclusory allegation of conspiracy to restrain trade will not survive a motion to dismiss. The notice pleading rules do contemplate a statement of circumstances, occurrences, and events in support of the claim being presented. *City of Gainesville*, 488 F.Supp. at 1263. Although the pleading need not list with "evidentiary specificity" the acts complained of, it must comprehend a "so-called prima facie case." *Quinonez*, 540 F.2d at 824.

## II. *The Sherman Anti–Trust Act*

Section 1 of the Sherman Anti–Trust Act renders illegal every contract, combination and conspiracy in restraint of trade or commerce among the several states. 15 U.S.C. § 1. The clear purpose of the Sherman Anti–Trust Act is to prohibit combinations which would probably interfere with the free exercise of the rights of those engaged in interstate commerce. *Quinonez*, 540 F.2d at 828. In order to state a claim for a per se violation, the complaint must contain allegations adequate to show a violation and, in private treble damages actions, that plaintiff was damaged thereby. In order to show a violation, plaintiff must show that the alleged restraint on trade tends or is reasonably calculated to prejudice the public interest. *Id.; Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266 (5th Cir.1979).

In essence, plaintiff is attempting to allege a vertical restraint on trade which involves a per se violation of the Sherman Act—a price maintenance plan. Generally, an agreement between manufacturers and distributors as to the price at which the distributors will sell the goods is a per se violation of the Sherman Act. *Helicopter Support Systems, Inc. v. Hughes Helicopter, Inc.*, 818 F.2d 1530 (11th Cir.1987). Before liability can attach, however, Section 1 of the Sherman Act requires proof of a combination or agreement. Without such a combination or agreement, express or implied, the manufacturer may exercise its long recognized right to refuse to deal with a customer that does not adhere to the terms of a previously announced sale by the manufacturer. *Belk–Avery, Inc. v. Henry I. Siegel Co., Inc.*, 457 F.Supp. 1330 (M.D.Ala.1978). Thus, as factual support for its claim, plaintiff points to a concerted plan between defendant and other unnamed distributors to force plaintiff to sell the goods at a specified price. Plaintiff contends that, to coerce plaintiff to adhere to the plan, defendant engaged in price discrimination between it and other distributors. When plaintiff still failed to comply, its distributorship was terminated. After the termination, plaintiff alleges that the coercion continued with defendant's interference in its contractual relations with Eckerd.

Defendant asserts that plaintiff failed in its attempt to allege a conspiracy as required by the Sherman Act. Generally, there are three categories of refusals to deal: (1) unilateral refusals to deal; (2) vertical refusals to deal; and (3) horizontal

refusals to deal. *Ramco Int'l, Inc. v. Travex Corp.*, 531 F.Supp. 796 (S.D.Fla.1982). Rather than alleging facts in support of the stated conspiracy, defendant argues that plaintiff demonstrates nothing more than a unilateral and independent action on behalf of defendant. As a general rule, a manufacturer has a right to deal, or refuse to deal, with whomever it chooses so long as the decision is made independently. Such unilateral refusals to deal are not violative of section 1 of the Sherman Anti–Trust Act.[1] Instead, in order to establish a cause of action for a vertical refusal to deal, as plaintiff attempts here, plaintiff must allege a factual basis for a "combination or conspiracy flowing from a pattern of concerted efforts consciously pursued to attain a trade restraint." *Id.* at 800.

■ Specifying where plaintiff's failure lies, defendant points to plaintiff's contention that defendant, as a result of complaints by distributors, entered into a price maintenance plan in order to keep uniformly higher prices charged in the market. Then, as a result of plaintiff's failure to abide by the new plan, its distributorship with defendant was terminated. Supporting its argument with case law, defendant demonstrates that this set of facts cannot alone establish a conspiracy under the Sherman Act. The Court agrees. However, defendant failed to address the remaining allegations in plaintiff's complaint—allegations which are said to support a conspiracy theory.

Liberal pleading rules aside, the Court notes that the requisites of pleading this cause of action are not met by a mere allegation that there was a combination, contract and conspiracy which tended to prejudice the public interest and which was anti-competitive in nature. Such a mere allegation is but a legal conclusion. To state a cause of action, the plaintiff must allege the facts constituting the conspiracy, its object and accomplishment. This plaintiff has failed to do.

■ The Court begins its analysis of plaintiff's failure with a look at the refusal to deal case law cited by defendant. In support of its argument, defendant points to case law involving summary judgment standards. *See Helicopter Support*, 818 F.2d at 1533; *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Despite the use of summary judgment in these cases, they plainly establish that a manufacturer's termination of a price cutting distributor after receiving complaints from other distributors does not violate the Sherman Act if the termination is a product of an independent determination that the price cutting distributor undermines the manufacture's legitimate marketing plans. It is clear that such an allegation, without more, is insufficient to state a claim for a collusive price-fixing agreement. *Helicopter Support*, 818 F.2d at 1533.

---

**1.** However, under certain circumstances, unilateral refusals to deal may be violative of Section 2 of the Sherman Anti–Trust Act. This section proscribes monopolization and attempts to monopolize and, thus, may embrace a unilateral refusal to deal when it is accompanied by an intent to monopolize and the requisite degree of market power. No concerted action is necessary. Instead, monopolistic or other anticompetitive intent is the key factor in determining whether a statutory violation has occurred under this section. Thus, when a refusal to deal is involved, an action may be stated only where the refusal is designed to have anticompetitive effect, such as where the monopolist's intent is to gain greater market share, to drive up prices, or to obtain some other illegal goal. *Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial Inc.*, 919 F.2d 1517 (11th Cir.1990) (furniture buyer lacked standing to challenge commercial factor's refusal, as alleged monopolist, to deal with it absent allegation that factor's refusal to extend credit was attempt to garner more market share or to accomplish any other anticompetitive end); *Nat'l Indep. Theatre Exhibitors, Inc. v. Charter Financial Group, Inc.*, 747 F.2d 1396 (11th Cir.1984) (film distributor's refusal to grant film distribution rights to plaintiff association could not be viewed as a predatory refusal to deal, as proscribed by the Sherman Act, because defendant plainly lacked sufficient market power to present a dangerous probability of success). Because plaintiff here neither alleged this legal claim in its complaint, nor the facts necessary to support all of the elements of such action, the Court will not consider whether plaintiff can state a claim for relief under Section 2 of the Sherman Anti–Trust Act.

These cases base their conclusions on the *Colgate* doctrine enunciated in *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). *Colgate* established that a manufacturer has the right to select its customers and to refuse to sell its goods to anyone for reasons sufficient to itself. Thus, the manufacturer, having announced in advance the circumstances under which he will refuse to sell, such as observance of a price maintenance policy, may bring about adherence to it by refusing to deal with customers who do not observe that policy. *Id.* at 300, 39 S.Ct. at 465.

*Colgate* and *Monsanto*, standing alone, clearly show that plaintiff's mere allegation of distributor complaints and subsequent termination are insufficient to state a cause of action. Whether the remaining allegations are sufficient, however, requires a further development of the case law, something which both parties failed to do.

Despite the obvious revitalization of *Colgate* by the Supreme Court in *Monsanto*, there is a period of time in between the two decisions where the Supreme Court handed down decisions that had the effect of retreating from the *Colgate* doctrine. The problems that have arisen from the inconsistencies between these two lines of decisions are fully discussed in Areeda, Antitrust Law, vol. VII §§ 1439–1452 (1986). Without digressing into the same full-blown evaluation, this Court will entertain a brief overview of the retreating case law and discern what effect, if any, *Monsanto* plays. The Court begins its discussion with a review of *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the Supreme Court decision that first took note of the retreat.

*Parke, Davis* evaluated the distinction established in *Colgate* between a refusal to deal that is violative of the Sherman Act and that which is not. The *Colgate* decision holds a manufacturer's decision to refuse to deal with another to be unilateral where the manufacturer merely "indicates his wishes and declines further dealings with all who fail to observe them." On the other hand, an unlawful combination can be stated where the manufacturer enters into agreements—whether express or implied from the course of dealing or other circumstances—with all customers and those agreements bind the customers to observe the fixed resale prices. *Id.* at 39, 80 S.Ct. at 509. Thus, under the same facts, the manufacturer's decision will not be considered unilateral if some sort of agreement is entered between the manufacturer and, for example, other distributors, to follow a price maintenance plan. Complaints alone, though, will not establish an agreement. Although the *Parke, Davis* Court believed that the *Colgate* Court was correct in holding that a simple refusal to sell to customers who would not sell at stated prices did not violate the Sherman Act, upon reviewing subsequent case law, the Court determined that an actual agreement, whether express or implied, was not the only means of establishing a conspiracy.

In evaluating the *Colgate* decision and subsequent case law, the *Parke, Davis* Court, in effect, narrowed the *Colgate* doctrine's protection. It established that in order to state a claim under the Sherman Act, a plaintiff must allege "something more" than a mere announcement of policy and refusal to deal. *See Balogh's of Coral Gables, Inc. v. Getz*, 510 F.Supp. 741 (S.D.Fla.1981). This revision of the *Colgate* doctrine, known as the "Colgate plus" doctrine, condones only an announcement to the trade of a policy followed by a refusal to deal with those who will not observe it. Once the policy is announced, if the manufacturer engages in any more extensive conduct wherein it employs coercive devices beyond mere customer selection in order to obtain acquiescence, the manufacturer loses its *Colgate* immunity. Thus, if a manufacturer takes coercive affirmative action that goes beyond the simple refusal to deal, the requisite element of a "combination or conspiracy" is established. *Ramco*, 531 F.Supp. at 801; *Belk–Avery*, 457 F.Supp. at 1334. Only where the customer's acquiescence is the product of free choice, prompted alone by the desirability of the product, will the refusal to deal be deemed unilateral. *Belk–Avery*, 457

F.Supp. at 1334; *Parke, Davis*, 362 U.S. at 47, 80 S.Ct. at 513.

Because an express agreement is not required under the Colgate plus doctrine, there is an implication that an implied agreement can exist simply through widespread compliance with a manufacturer demand or suggestion in order to avoid termination. Areeda, § 1448a at 101. Not only is this implied acceptance view inconsistent with *Monsanto*, this Court believes that the *Monsanto* decision may have, in effect, limited the continuing narrowness of the Colgate doctrine that *Parke, Davis* and its progeny seemed to be promulgating. In fact, even though the *Parke, Davis* Court emphasized implied agreement language in prior Supreme Court cases, it did not purport to find agreements simply in dealer compliance with announced conditions. Instead, the manufacturer's actions in *Parke, Davis* involved a scheme which, as a whole, evidenced a complex enforcement beyond a mere announcement and simple refusal to deal. *See* Areeda, § 1449b at 111–112.

The affirmative steps taken by the manufacturer in *Parke, Davis* after announcing its policy to cease dealing with wholesalers who failed to comply with its specified wholesale price, or who sold to retailers who failed to comply with the specified wholesale price, include that manufacturer's action in actively seeking assurances of compliance. The manufacturer received not only the assurances, but the compliance as well. It informed retailers that deviators would not be supplied the products by it or by wholesalers. In turn, several wholesalers reported discounting retailers and the manufacturer negotiated directly with several of the retailers. When one retailer was approached, it affirmatively agreed to abide by the manufacturer's policy. All of these actions, in addition to several more agreements to abide, evidenced more than a simple enforcement of announced conditions on future dealing. *Parke, Davis*, 362 U.S. at 45–46, 80 S.Ct. at 512–513.

*Monsanto*, although revitalizing the basic concept of *Colgate*, simply further defines what is needed in addition to the basic unilateral refusal to deal allegation in order to state a claim. According to the Court in *Monsanto*, what is needed is an agreement. The type of agreement required is one which evidences a "meeting of the minds" or "common scheme." This agreement cannot be shown by conformity with the manufacturer's specified behavior, and, thus, it is evident from the Supreme Court's opinion that complaints from other distributors, compliance with the manufacturer's request, and termination of the distributorship are not enough to show agreement. Rather, the "something more" in *Monsanto* which was sufficient to show a conspiracy or agreement was evidence regarding communications made between the manufacturer and distributors and acceptance of the distributors of the plan. *Monsanto*, 465 U.S. at 764 n. 9, 104 S.Ct. at 1471 n. 9 (concept of "meeting of the minds" or a "common scheme" means that evidence, in addition to distributor compliance with the suggested price, must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer).

To hold that an agreement can be implied simply from complaints of the distributors would open the courthouse doors to a flood of litigation. Moreover, because such communication between distributors and manufacturers arise during the normal course of business in order to ensure an efficient distribution system, to hold otherwise would "both inhibit management's exercise of its independent business judgment and emasculate the terms of the statute." *Id.* at 764, 104 S.Ct. at 1471.

In evaluating the effect *Monsanto* has on the string of case law represented by *Parke, Davis*, the Court finds it clear that the *Monsanto* Court did not adopt the implied acceptance or coercion theory of agreement. Instead, it emphasized the need for direct or circumstantial evidence of a traditional type of agreement. The *Monsanto* Court was clear that unwilling compliance by dealers to avoid termination does not create an agreement and that compliance with a suggestion or announced condition does not amount to an implied agreement.

Nevertheless, *Monsanto* did not overrule the possibility of agreements like those evidenced in *Parke, Davis* where complex, concerted activity was evident in addition to the compliance of the dealers. In fact, *Monsanto* did not even address such agreements. Moreover, albeit indirectly, there is an indication that the Eleventh Circuit finds such evidence of agreement viable. *See DeLong Equipment Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499 (11th Cir.1989); *Bryant Heating and Air Conditioning*, 597 F.Supp. at 1045 (court found that complaint fairly alleged a vertical coerced conspiracy to maintain re-sale prices).

■ Accordingly, this Court can only find that *Monsanto* acted to confirm the idea established in *Colgate* that a simple announcement and termination does not amount to the kind of agreement necessary to state a claim under the Sherman Anti-Trust Act. Where the actions involved are announcement and termination; monitoring of dealer performance through one's own employees or otherwise; or the use of third parties—to carry the message or to contact customers or replacement dealers—to effect a termination, no agreement is shown. At the same time, *Monsanto* leaves open the possibility of proving agreements by evidence that the manufacturer actively sought agreement through complex, coercive means. Such evidence would naturally require a showing of individualized negotiations with dealers, meetings, repeated exhortations, and the use of third parties in a way other than to gather information or to effect a termination. *See* Areeda, § 1446 at 82–94.

With these concepts in mind, the Court now turns to the determination of whether plaintiff's complaint states a cause of action. First, the Court finds faulty plaintiff's contention that it sufficiently stated a cause of action by simply alleging that defendant, "in cooperation and concert with several of these distributors, agreed to enforce a resale price maintenance plan and to coerce" plaintiff into compliance with the pricing policy. Plaintiff's next allegation, that "as part of such coercion to ad-

here to higher prices, Mirta de Perales withdrew certain payment terms and discounts which had been previously available to Ben Sheftall and remained available to other independent distributors," is likewise faulty. There are no facts alleged in either contention, only conclusory allegations of the elements of the Sherman Act cause of action.

Such a failure to allege facts flies in the face of the *Conley* standard. Although plaintiff may not be able to allege actual acts of agreement or conspiracy, it must at least set forth facts from which an inference of unlawful agreement can be drawn. *Brett*, 461 F.2d at 1158. Although the Court is required to accept the facts which are well pleaded to be true and resolve them in the light most favorable to plaintiff, the Court need not extend such deference to completely conclusory statements which fail to give adequate notice to the opposing party or the Court. *City of Gainesville*, 488 F.Supp. at 1264. Unless the statements made by plaintiff are accompanied by sufficient facts, such as in *Quinonez* and *Brett*, no claim is stated. Instead, like the allegations in *City of Gainesville* and *Lombard's Inc. v. Prince Manufacturing, Inc.*, 753 F.2d 974 (11th Cir.1985), plaintiff's statements make only conclusory allegations of conspiracy and allege no facts to demonstrate the conspiracy or identify specific participants in the conspiracy.

■ Plaintiff's final allegation, other than the allegation of complaints combined with refusal to deal and termination, which has already been determined not to state a cause of action alone, similarly fails the *Conley* test. Here, plaintiff does allege facts. However, they are not sufficient to state a cause of action under the guiding principles mentioned above. Plaintiff alleges that, after the termination of its distributorship, it obtained defendant's products and sold them to one of its retail stores, Eckerd. When defendant learned of this action, it, according to plaintiff, approached Eckerd and informed Eckerd that plaintiff was no longer receiving its products and was, therefore, distributing

stale and damaged goods. Defendant encouraged Eckerd to discontinue its relationship with plaintiff and purchase its products from another distributor. Plaintiff alleges that as a result of this action, Eckerd discontinued using it as a distributor not only of defendant's products, but of other Hispanic beauty products as well.

While these facts may state a claim for intentional interference with business relations, they do not support a conspiracy claim under the Sherman Anti–Trust Act. There are no facts alleged showing any concerted effort on the part of defendant and the unnamed co-conspirator distributors. This is simply a unilateral action taken by defendant *after* its relationship with plaintiff ended. Perhaps, if plaintiff alleged facts that defendant approached Eckerd before the relationship ended, solicited and obtained Eckerd's agreement not to accept products distributed by plaintiff unless plaintiff agreed to the price maintenance plan, and identified the distributor to whom Eckerd's business went (in addition to an agreement between defendant and this distributor to take this business), a claim might be stated. Moreover, there is no time frame given in which this alleged conspiracy occurred. Plaintiff alleges that it began in 1983, when it first received the distributorship, but plaintiff has not even identified when this alleged price maintenance agreement went into effect or when its distributorship was terminated. Further, plaintiff has not identified any damages that it suffered. Apparently, defendant is only one of many manufacturers that plaintiff used, and, even if an agreement was established, there is no indication given that this would indeed cause a restraint on trade.

Plaintiff's complaint simply does not allege the "something more," either in the form of an agreement or coercive action, necessary to go beyond the unilateral right to refuse to deal. In *Balogh's*, for exam-

ple, there was an indication that the plaintiff's competitor and an exclusive distributor entered into an agreement where the competitor would act as the principal outlet for the distributor. This agreement, however, was contingent on the continued exclusion of plaintiff from the market. The court held that these allegations of an agreement to exclude went well beyond the unilateral right to refuse to deal. *Balogh's*, 510 F.Supp. at 744. Similarly, *FTC v. Beech–Nut Packing Co.*, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922), and *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944), cases discussed by the *Parke, Davis* Court in its decision to narrow *Colgate*, reflect the kind of methods used that have been condemned as evidencing unlawful combinations in refusal to deal cases. In both cases, the manufacturer's policed the pricing of its customers through the use of codes or certificates. There is no factual support of any similar conduct in plaintiff's complaint, and, therefore, the complaint cannot stand.

### III. *The Robinson–Patman Act*

■ Plaintiff similarly fails to state a claim under this Act. Per the above discussion, by failing to allege any facts other than conclusory allegations that it was injured as a result of the alleged price maintenance plan, plaintiff has not satisfied the *Conley* standard. To state a claim for treble damages under § 4 of the Clayton Act, plaintiff must allege that it has been injured in its business or property by acts of defendant which are in violation of the antitrust laws.[2] In addition, plaintiff must give some indication of the amount of damages done. *Quinonez*, 540 F.2d at 829.

Assuming that an antitrust violation has occurred, the Court finds that, besides the obvious loss of defendant's distributorship, plaintiff has not alleged how defendant's actions harmed it. Again, referring to the

---

**2.** The antitrust violation, that plaintiff was injured by defendant's discriminatory pricing policies, is similarly alleged inadequately. In order to state a price discrimination cause of action, plaintiff must allege that there were two sales made by the same seller, i.e. defendant, to at least two different purchasers at different prices. *DeLong*, 887 F.2d at 1516. Although plaintiff makes a general allegation that such was done, it failed to identify another distributor that received a better price and he did not aver what that price was.

lack of facts regarding defendant's share of the market and the percent that defendant's products played in plaintiff's business, the simple loss of the distributorship does not establish an antitrust injury. *See Larry R. George Sales*, 587 F.2d at 266; *Boczar v. Manatee Hospitals & Health Systems, Inc.*, 731 F.Supp. 1042 (M.D.Fla. 1990) (conclusory allegations that defendant violated the antitrust laws and plaintiff was injured thereby will not survive a motion to dismiss if not supported by facts constituting a legitimate claim for relief).

THE GEORGIA CLAIMS

Because the Court is dismissing the federal claims, it declines to retain the pendent state law claims. Therefore, both plaintiff's Georgia antitrust and interference with business relations claims are dismissed.

CONCLUSION

Although the Court finds sufficient basis to dismiss plaintiff's federal antitrust claims for failure to state a claim under Rule 12(b)(6), the Court recognizes that plaintiff may be able to allege the requisite facts. Accordingly, given the liberal policy of allowing a party to amend a complaint when justice so requires, the Court grants plaintiff the opportunity to amend its complaint to set forth sufficient facts as discussed in this Order. Upon amending the complaint, plaintiff will be entitled to reassert its pendent state claims that are dismissed pursuant to this Order. Consequently,

IT IS HEREBY ORDERED that defendant's motion to dismiss plaintiff's complaint be and is granted. Plaintiff is given thirty (30) days in which to amend its complaint if it so desires.