**CARLSON MACHINE TOOLS, INC.,**
**Plaintiff-Appellant,**

v.

**AMERICAN TOOL, INC., Subsidiary of Fischer Industries, Inc., Fischer Industries, Inc. and John D. Hendrick, Defendants-Appellees.**

**No. 81–2462.**

United States Court of Appeals,
Fifth Circuit.

June 23, 1982.

Schleider, Ewing & Francis, Ben H. Schleider, Jr., Paul S. Francis, Houston, Tex., for plaintiff-appellant.

William A. Huddleson, Cincinnati, Ohio, Lapin, Totz & Mayer, Larry Huelbig, Houston, Tex., for defendants-appellees.

Before BROWN, RANDALL and TATE, Circuit Judges.

TATE, Circuit Judge:

Carlson Machine Tools, Inc. ("Carlson"), a distributor of machine tool lathes, sued American Tool, Inc. ("American"), a manufacturer of machine tool lathes, claiming that American violated the antitrust laws through a boycott, resale price maintenance, and unreasonable territorial distribution restrictions. Carlson also claimed that American breached its distribution contract and various purchase agreements with Carlson, and that an American corporate officer tortiously interfered with Carlson's business relationships. The district court, 523 F.Supp. 1349, granted summary judgment in favor of American on all counts. Carlson appeals, contending that it raised material issues of fact on each claim, and that the trial court erred in granting summary judgment. We agree with Carlson that the trial court erred in granting summary judgment on Carlson's claim concerning breach of the distributorship agreement and breach of one purchase agreement. However, we affirm the summary judgment on all remaining counts.

## I. Facts

This case involves an appeal by Carlson from a grant of summary judgment in favor of American. Facts asserted by Carlson " 'if supported by affidavits or other evidentiary material, are regarded as true.' " *Coke v. General Adjustment Bureau, Inc.,* 640 F.2d 584, 595 (5th Cir. 1981) (quoting Wright & Miller, Federal Practice and Procedure: Civil § 2727 at 530 (1973)).

American manufactures machine tool lathes, and under the distribution system used during the time relevant to this appeal, marketed its lathes through independent distributors who received exclusive territories to sell American lathes. Ameri-

can furnished suggested retail price lists to its distributors, who quoted specifications and prices to customers. After a purchase order was placed with the distributor, and approved by American, American invoiced the distributor who resold the lathes to the customer.

Carlson began as an American distributor in 1962. Its exclusive territory consisted of south Texas, exclusive of Travis and Williamson counties. Carlson requested American to include Travis and Williamson counties in its territory, but American refused, citing Carlson's lack of sales personnel to serve the area for which it was responsible.

In 1979, American and Carlson entered into a new distributorship agreement, which had a duration of one year and was thereafter automatically renewable from year to year. Either party could terminate the agreement during its first year for "just cause" on thirty days' prior written notice (no cause was required for termination thereafter), and American had the right to act as "sole judge" in determining if Carlson's performance warranted continued affiliation. American claims that it entered into an identical agreement (save for differences in territory) with all of its distributors "as part of an effort to update existing contracts." American br. at 3. Carlson's new contract was sent to Carlson in April 1979 and was dated April 15, 1979. Carlson did not sign and return the contract to American until mid-May 1979.

American notified Carlson by a letter dated June 1, 1979, that Carlson's distributorship was terminated as of that date, and Carlson argues that American did not provide Carlson with the required thirty-days' notice.[1] American claimed that it terminated Carlson for breaching its distributorship agreement in that: (1) Carlson refused to maintain enough sales personnel to serve its area; (2) a Carlson salesman abused a potential customer by leaving a sales meeting; (3) Carlson canceled a stocking order for American "Eagle" lathes; and (4) Carlson maintained a poor sales record in relation to the industry sales averages in the Texas market.

American replaced Carlson with Selby-Horan, a competitor of Carlson's whose supplying manufacturer decided to enter the south Texas market directly. According to Carlson, American's negotiations with Selby-Horan commenced about the same time that American was encouraging Carlson to sign the new distributorship agreement that American sent to it in April 1979.

Carlson claimed that the reasons given by American for its cancellation were pretextual, and it brought suit against American claiming damages caused by American's alleged violation of federal antitrust laws,[2] breach of contract with Carlson, and tortious interference with Carlson's business relationships. After extensive discovery, American moved for summary judgment on all counts, and the district court granted the motion.[3]

II. *Issues*

On appeal, Carlson argues that the trial court erred in finding that no genuine fact issues existed with respect to Carlson's

1. American stated in its termination letter that Carlson was terminated as of the date of the letter—June 1, 1979. The letter also stated, however, that American would continue to honor orders from Carlson based on outstanding quotations until July 9, 1979. Carlson's claim that the termination violated the notice provision of the distribution agreement is discussed in section V, part A of this opinion.

2. Carlson also claimed that American engaged in violations of the Robinson-Patman Act, 15 U.S.C. § 13, but later declared its intention to omit this claim from its amended pleadings. The district court accordingly dismissed the price discrimination count. The district court also dismissed Carlson's complaint under section 2 of the Sherman Act, 15 U.S.C. § 2, charging monopolization. Carlson did not appeal these dismissals.

3. The trial court found that no factual dispute existed as to: relevant product and geographic market, the roles of the parties in the manufacturing and distribution chain, the use of an exclusive distribution system and suggested retail prices by American, the corporate status of American, and the fact that substantial interstate trade or commerce was involved. The parties do not dispute these determinations.

claims that: (1) American and Selby-Horan engaged in an illegal boycott of Carlson; (2) American engaged in resale price maintenance; (3) American engaged in unreasonable market division through its distribution system; (4) American breached its agreement by termination with Carlson in bad faith and with fraud; (5) American breached its purchase agreement with Carlson concerning its sale to Carlson of American "Eagle" lathes; and (6) an American employee had tortiously interfered with Carlson's business relationships by terminating Carlson for personal reasons. Carlson also urges that a different standard for determining the propriety of summary judgment is applicable in antitrust cases. We will consider each of these contentions in turn.

### III. *Prelude: An Antitrust Summary Judgment Standard?*

In addition to its specific arguments concerning why summary judgment was inappropriate to resolve its various claims, Carlson contends that as a general matter, summary judgment is "not appropriate where motive and intent" questions are involved. Carlson br. at 21. Carlson relies on *White Motor Company v. United States*, 372 U.S. 253, 259, 83 S.Ct. 696, 700, 9 L.Ed.2d 738 (1963) and *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

Although *White* and *Poller* certainly do warn against the use of summary judgment where motive and intent issues are involved, this should not be understood as holding antitrust cases to be inherently incapable of resolution by summary judgment. In *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Supreme Court explicitly declined to eliminate summary judgment in antitrust cases:

> To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it.

391 U.S. at 289–90, 88 S.Ct. at 1593.

In a recent examination of the use of summary judgment in antitrust cases, we stated that Fed.R.Civ.P. 56 is not suspended just because a case is based on the antitrust laws:

> The reason summary judgments may seem less common in antitrust cases is because such cases are ripe with issues of motive, intent and credibility which often must be inferred from the total circumstances. Antitrust cases are not necessarily ill-suited for summary procedures; those antitrust cases and any other types of cases which raise genuine issues of motive, intent and credibility, however, are suited for a full hearing.

*Aladdin Oil Company v. Texaco, Inc.*, 603 F.2d 1107, 1111 (5th Cir. 1979). We recently affirmed this rule: "In an antitrust case . . . . summary judgment is still appropriate where the plaintiff does not produce 'significant probative evidence demonstrating that a genuine issue of [material] fact exists.'" *Joe Regueira, Inc. v. American Distilling Company, Inc.*, 642 F.2d 826, 829 (5th Cir. 1981) (quoting *Pan-Islamic Trade Corporation v. Exxon Corporation*, 632 F.2d 539, 554 (5th Cir. 1980), *cert. denied*, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981)).

In antitrust cases, as well as others, the party that moves for summary judgment has the burden of proof to show that no material issue of fact exists, with all doubts about such existence resolved against the moving party. *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980). The party opposing summary judgment "must meet the movant's affidavits with opposing affidavits setting forth specific facts to show why there is an issue for trial, or at the very least stating reasons why he cannot do so." *Gossett v. Du-Ra-Kel Corporation*, 569 F.2d 869, 872 (5th Cir. 1978). *See also Regueira, supra*, 642 F.2d at 829.

## IV. The Antitrust Issues

### A. Substitution of Distributors: A Vertical Boycott?

Carlson's first contention is that the district court erred in granting summary judgment in favor of American on Carlson's claim that American and Selby-Horan combined and conspired to eliminate Carlson from the sale of machine tool lathes in the south Texas market. Carlson's argument, as we understand it, is that a jury could infer the existence of a vertical boycott (a boycott arranged between a manufacturer and a distributor aimed at injuring a third party) on the basis of negotiations between American and Selby-Horan that transpired prior to Carlson's termination. Prior negotiations, according to Carlson, give rise to a "clear fact issue" concerning whether American and Selby-Horan conspired to eliminate Carlson as a competitor.

Carlson's argument must be rejected. Carlson's termination was the result of American's decision to grant the exclusive distributorship for the south Texas marketing area to Selby-Horan. As such, American imposed a vertical non-price restraint. The arrangement is characterized as "vertical" because it involves parties "at different levels of the market structure, e.g., manufacturers and distributors," and is to be distinguished from agreements between or among competitors "at the same level of the market structure," which are characterized as "horizontal" restraints. *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). The grant of an exclusive franchise is considered a "non-price" restraint because, without more, such a grant does not seek to impose resale price maintenance on the distributor.

As a vertical non-price restraint, American's substitution of distributors must be subjected to rule of reason analysis under *Continental T.V., Inc. v. GTE Sylvania Incorporated*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), and not per se analysis, as Carlson suggests. Rule of reason analysis requires that the legality of American's grant of an exclusive territory to Selby-Horan at the expense of terminating Carlson be determined by considering the actual anticompetitive effects of the practice. This is in contrast with the principle of per se unreasonableness, where the practice complained of has such an inherently harmful effect on competition that it should be "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm" created by the practice. *Northern Pacific Railway Company v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

*Sylvania* involved a marketing arrangement whereby Sylvania, in an effort to sell more color television sets, phased out the wholesaler tier of distribution and sold its televisions directly to retailers who were given franchises in particular areas. Sylvania retained the discretion to increase the number of franchised retailers in a particular area, and it acknowledged that the purpose of this arrangement was to decrease the number of Sylvania retailers. One of Sylvania's franchisee's brought suit, claiming that Sylvania violated the antitrust laws by entering into and enforcing franchise agreements that prohibited the sale of Sylvania televisions from other than certain locations designated by Sylvania. The Supreme Court held that Sylvania's non-price vertical restraints concerning location were to be tested under the rule of reason because such restraints have a tendency to increase *interbrand* competition (competition amongst those who manufacture the same type of product), although they do result in a reduction of *intrabrand* competition (competition amongst the retailers or wholesalers of the product of a single manufacturer). *See Sylvania, supra*, 433 U.S. at 51–52, 52 n. 19, 97 S.Ct. at 2558, 2558 n. 19.

The trial court in the present case found, and Carlson does not dispute, that American's share of the machine tool lathe machine market in South Texas never exceeded ten percent, and that the number of competitors in that market is increasing. The court observed that as a result of American's grant of the South Texas dis-

tributorship to Selby-Horan, "interbrand competition has increased and . . . the effect of Plaintiff's termination on intrabrand competition is de minimis."

Carlson does not challenge the trial court's findings with respect to market share and the increase in interbrand competition. Rather, Carlson argues only that the jury could have inferred the existence of "a boycott" by American and Selby-Horan against Carlson to exclude it from the lathe market in South Texas. Carlson relies on *United States v. General Motors Corporation*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) and *Klors's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

■ The difficulty with Carlson's argument is that if it were accepted, *Sylvania* would be a meaningless decision. All that Carlson alleges that American and Selby-Horan did was to engage in action that was *necessary* for American to effect a dealer substitution. Although a vertical non-price restraint might be open to challenge as per se illegal if it were in furtherance of a per se violation of the antitrust law, there is no allegation by Carlson, or any proof in the record, that anything transpired between American and Selby-Horan other than negotiation that led to Carlson's termination and Selby-Horan's appointment as an American distributor. If a manufacturer negotiates, or reaches agreement, with a new distributor prior to his substitution of distributors, such negotiations do not, without more, amount to a violation of the antitrust law. *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 78 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).

Carlson's reliance on *General Motors* and *Klors's* is misplaced. In *General Motors*, the Court found an antitrust violation when General Motors and various automobile dealers and their associations conspired to "eliminate a class of competitors by terminating business dealings between them and a minority of Chevrolet dealers and to deprive franchised dealers of their freedom to deal through discounters if they so choose." 384 U.S. at 140, 86 S.Ct. at 1327–28. The Court in *General Motors* explicitly refused to consider "the meaning, effect, or validity of the 'location clause' " in the General Motors Dealer Selling Agreement whereby a franchised dealer was prohibited from "moving to or establishing 'a new or different location, branch sales office, branch service station, or place of business . . . without the prior written approval of Chevrolet.' " 384 U.S. 139, 86 S.Ct. at 1327. In *Klors's* the Court stated explicitly that it was not considering a situation involving "a manufacturer and a dealer agreeing to an exclusive distributorship," but rather one involving "a wide combination consisting of manufacturers, distributors and a retailer" aimed at boycotting an existing competitor. 359 U.S. at 212–13, 79 S.Ct. at 709–10.

Carlson claims that "[b]oth American Tool and Selby-Horan admitted that if Carlson were terminated that Carlson would not be readily able to find another manufacturer whom it could represent in the South Texas market, particularly a U.S. manufacturer." Carlson br. at 25. Carlson cites the deposition of Selby-Horan Vice-President Roper as support for this statement. Upon our review of the cited portion of the deposition, we discovered that Roper stated only that he assumed that his appointment as the American distributor for south Texas meant that Carlson "certainly wouldn't be selling American anymore." Roper depo. at 44. Even if Selby-Horan and American did admit that they thought that Carlson would find it difficult to re-enter the market, we fail to see how this belief, without more, could give rise to the existence of a boycott to exclude Carlson.

### B. *Resale Price Maintenance: A Contingent Event*

The second antitrust attack launched by Carlson is that American conspired with its distributors, including Carlson, to maintain and stabilize the retail prices at which American's machines were sold to the public through resale price maintenance. Carlson points to American's use of suggested retail

price lists, and to its practice of actively encouraging retailers to adhere to these suggested prices.

 Resale price maintenance of maximum or minimum price is a per se violation of the antitrust laws. *Albrecht v. Herald Company*, 390 U.S. 145, 151–52, 88 S.Ct. 869, 872–73, 19 L.Ed.2d 998 (1968); *Dr. Miles Medical Company v. John D. Park & Sons Company*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).[4] The mere suggestion of list prices by a manufacturer, however, is not enough to establish the existence of resale price maintenance. *See United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).[5] Resale price maintenance occurs " 'when a price is announced and some course of action is undertaken or threatened contingent on the willingness or unwillingness of the retailer to adopt the price. . . . [resale price maintenance] must involve making a meaningful event depend on compliance or non-compliance with the "suggested" or stated price.' " *Aladdin Oil, supra*, 603 F.2d at 1117–18 (quoting *Butera v. Sun Oil Company*, 496 F.2d 434, 437 (1st Cir. 1974)). Evidence of exposition, persuasion, argument, or pressure on the part of the manufacturer is insufficient, without more, to establish coercion required for resale price maintenance. *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 53 (2d Cir. 1980).

 In the present case, American admits that it circulated suggested retail price lists to distributors, and that if distributors attempted to charge more than those prices, American would take the side of the customer. Nevertheless, Carlson has not alleged any act by American that could be characterized as coercive enforcement of the suggested prices.

 In its reply brief, Carlson tries unsuccessfully to allege the existence of a "meaningful event" in that one of the reasons American gave for its termination of Carlson was Carlson's cancellation of its order for six "Eagle" lathes. Carlson claims that it canceled the order because American raised the "Eagle" price in violation of its purchase agreement with Carlson, and because Carlson did not want to be "committed to purchase machines at an unknown price." Carlson br. at 14. Carlson admits that the six "Eagles" it canceled were "stock" machines, which had not been sold to any customer. Carlson also admits after it canceled its order, but before its termination, it entered into an agreement with American for more "Eagle" lathes with no indication that it objected to the increased price. Nevertheless, Carlson wishes to characterize its termination as a result of its objection to American's suggested retail price policy merely because the price increase would be reflected in the suggested retail price. This putative characterization does not raise an issue of fact as to *re*sale price maintenance: the dispute between Carlson and American concerning the American lathes had nothing to do with American's policy of suggesting retail prices—the dispute was concerned only with the price that *Carlson* would have to pay American for its stock, and Carlson's belief that American breached its purchasing agreement by raising the price of the lathes.

### C. Geographic Allocation

Carlson's third antitrust argument assumes that territorial restraints are to be judged by the rule of reason standard in *Sylvania, supra.* Carlson claims, however, that the American distributor in Travis and Williamson counties was not effectively serving those areas for American, but that American refused to include them in Carlson's area. Carlson concludes: "[A] real

---

4. For a discussion of why the per se illegality of resale price maintenance as a vertical price restraint should be reconsidered in light of *Sylvania*, see Baker, *Interconnected Problems of Doctrine and Economics in the Section One Labyrinth: Is* Sylvania *a Way Out?*, 67 Va.L. Rev. 1457, 1463–70 (1981).

5. We recognize, of course, that the *Colgate* doctrine, although still viable, has been narrowed by the Supreme Court, and criticized heavily by antitrust scholars. *See Aladdin Oil Company v. Texaco, Inc.*, 603 F.2d 1107, 1113–14 (5th Cir. 1979).

fact issue is presented as to whether it was reasonable for American to so rigidly maintain and enforce its territorial restrictions against Carlson." Carlson br. at 29. Carlson also views as unreasonable American's decision to include Travis and Williamson counties in Selby-Horan's territory when it replaced Carlson.

Carlson's argument is based upon a misunderstanding of *Sylvania.* The reasonableness of a non-price vertical restraint is to be judged by the effect it has on *interbrand* competition—"the primary concern of antitrust law." *Sylvania, supra,* 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19. Carlson does not allege that American caused any public injury through reducing *interbrand* competition by the imposition of its geographic restraints. Rather, Carlson claims only that American's territorial arrangements did not maximize *intrabrand* competition between American distributors.

## V. *The State-Law Claims*

### A. *Breach of Contract Re: Termination*

Carlson's first state-law claim is that the district court erred in finding no genuine issue of fact existed with respect to Carlson's claim that American breached its distributorship agreement with Carlson. The district court held that the reasons given by American for Carlson's termination were very persuasive and that Carlson did not carry its burden of setting forth specific facts to show that there was an issue of fact for trial. We disagree.

Although the contract between Carlson and American provided that during the first year of the agreement, either side may terminate the contract for "just cause" on thirty days' prior written notice, and that American was to be the "sole judge" of whether to continue with a particular distributor, Carlson argues, and American accepts, that the ability to terminate contractual relations under their contract during its first year for reasons of dissatisfaction is "naturally subject to the rule that the dissatisfaction cannot be fraudulent and in bad faith." American br. at 20. *See Kree*

*Institute of Electrolysis, Inc. v. Fageros,* 478 S.W.2d 569, 572 (Tex.Civ.App.1972); *Woodard v. General Motors Corporation,* 298 F.2d 121, 126 (5th Cir.), *cert. denied,* 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962). The burden of showing that American did not act in good faith in terminating the contract is on Carlson. See *Kree, supra,* 478 S.W.2d at 572.

Carlson argued before the district court that American feigned its dissatisfaction with Carlson and offered pretextual reasons for its termination. Carlson alleged specific facts to show that the reasons offered by American for its termination were pretextual in that: (1) Carlson hired a new salesperson in response to American requests to Carlson to increase its staff and that, in any event, it was common for American distributors to have staffing difficulties; (2) a Carlson salesman left a meeting with a potential American customer only after he ascertained that the customer was planning to purchase the machine from a location outside the exclusive location American allocated to Carlson; (3) Carlson canceled an order for six lathes only after American raised the price of the lathes and issued to all American distributors authorization to cancel their orders because of the price increase; and (4) that, contrary to American's claim that it had a "poor sales record," Carlson was a successful American distributor.

Further, Carlson alleged that all of the deficiencies with which American charged Carlson existed *before* American submitted the new agreement to Carlson, and that American demanded that Carlson sign the agreement in May 1979, only to terminate Carlson at the beginning of June 1979. Carlson also alleged that American and Selby-Horan began negotiations contemporaneously with American's offer to Carlson to sign a new agreement with American.

These factual allegations made by Carlson were supported by affidavits and various pieces of correspondence before the trial court. A fact question was thereby presented as to whether American feigned its dissatisfaction with Carlson as a pretext to substitute Selby-Horan.

Finally, Carlson contended that American breached the distributorship agreement by failing to give thirty-days' prior written notice to Carlson. In American's termination letter to Carlson, dated June 1, 1979, American informed Carlson that it was terminated as of that date, but that American would honor any orders from Carlson made on *outstanding* quotations to customers until July 9, 1979. The essence of American's argument, therefore, is that although it used "terminated" in describing its relationship with Carlson as of June 1, 1979, the real termination of the Carlson distributorship took place on July 9, 1979, more than thirty days from June 1.

Although this would ostensibly seem to be a matter of semantics concerning the practical import of "termination," the effect of American's June 1 termination was apparently that American was not obligated to honor any *new* orders placed by Carlson on the basis of quotations made by Carlson *after* June 1, 1979. Another issue of fact is thereby raised as to whether American provided the proper notice to Carlson before it terminated the agreement.

### B. *Breach of Contract Re: Lathe Increases*

Carlson placed two separate orders, each for six "Eagle" lathes. The first order was acknowledged by American, and the second order was not acknowledged. Carlson received four of the six machines in the acknowledged order before American imposed a price increase on the remaining two lathes. Carlson claimed that American breached its purchase agreements with Carlson concerning the lathes in both orders. The district court granted summary judgment in favor of American on the grounds that American acknowledged only the first order.

Carlson admitted that American acknowledged only the first order, but "accepted and never rejected or refused the second" order. The district court was correct in granting American's motion for summary judgment with respect to this second order. The terms and conditions of order acceptance, which Carlson submitted with its response to American's motion for summary judgment, states explicitly that American must acknowledge an order for it to be binding.

The district court was incorrect, however, in granting summary judgment on the issue whether American breached its purchase agreement with respect to the two machines that were part of the acknowledged order. American argues that a *later* arrangement with Carlson concerning Carlson's purchase of additional "Eagles" constituted an accord and satisfaction, and a waiver and release, of any claims that Carlson might have had against American concerning these two machines that were part of the acknowledged order. Whether the subsequent agreement between American and Carlson constituted an accord and satisfaction is a question of fact. *Roper v. Jeoffroy Mfg., Inc.,* 535 S.W.2d 706, 707 (Tex.Civ.App.1976), writ ref. n. r. e.; 1 Tex. Jur.3d *Accord and Satisfaction* § 38 (1979). Whether Carlson waived performance by American is also a question of fact. *Montgomery Ward & Company v. Robert Cagle Building Company,* 265 F.Supp. 469, 474 (S.D.Tex.1967); 13 Tex.Jur.2d *Contracts* § 329 (1960). Finally, whether Carlson released American from its obligation under the purchase agreement is a question of fact. *Pearce v. Hallum,* 30 S.W.2d 399, 401 (Tex.Civ.App.1930), writ ref.; 50 Tex.Jur.2d Rev. *Release* § 39 (1969).

American may wish to try to show that Carlson released American, waived performance by American, or entered into an accord and satisfaction with American. However, unless Carlson admits that these occurred, or American can establish their occurrence as a matter of law, fact issues are presented, the resolution of which was improper on summary judgment.

### C. *Tortious Interference*

Carlson's final state law claim is that a factual issue was raised as to whether American Vice-President Hendrick should be liable in his individual capacity for economically injuring Carlson because

Hendrick made the decision to terminate Carlson as a result of personal motives to harm Carlson. Under Texas law, a corporate officer will not incur personal liability for causing a corporation to take an economic action such as the one involved here, except possibly upon a showing that the affair went beyond his power or authority as a corporate officer, or that he engaged in fraud. *Southwestern States Oil and Gas Company v. Sovereign Resources, Inc.*, 365 S.W.2d 417, 422 (Tex.Civ.App.1963).

In the present case, American challenged Carlson's contention that Hendrick was motivated by improper motives and Carlson presented only the unsupported opinion of a former American employee that he believed Carlson's termination owed, in part, to friction between Hendrick and Carlson related to *business differences* between them. This opinion did not suffice to establish that Hendrick exceeded his capacity as a corporate officer, or acted fraudulently, in deciding to terminate Carlson. Summary judgment was properly entered as to this claim.

VI. *Conclusion*

We find that the district court acted properly in granting summary judgment with respect to the antitrust claims, the tortious interference claim, and the breach of purchase agreement claim as it related to the order for six "Eagle" lathes that was admittedly not acknowledged by American. We AFFIRM the district court disposition of those counts. We also find, however, that summary judgment was improvidently granted on the breach of distributorship agreement claim, and the breach of purchase agreements claim as it related to the two lathes in the acknowledged order. We REVERSE the district court disposition on those counts, and we REMAND for further proceedings.

AFFIRMED in part, REVERSED in part, and REMANDED.