**JEFFERS VET SUPPLY, INC., Plaintiff,**

v.

**ROSE AMERICA CORP., d/b/a BMB, a division of Rose America Corporation, Defendants.**

**No. Civ.A. 98–A–1329–S.**

United States District Court, M.D. Alabama, Southern Division.

Nov. 24, 1999.

James Hinton, Jr., Ellen E. Henderson, Birmingham, AL, for plaintiff.

Jackson R. Sharman, Anne Sikes Hornsby, Birmingham, AL, Ken M. Peterson, William B. Sorensen, Wichita, KS, for defendants.

### MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This action is brought under Section 1 of the Sherman Antitrust Act alleging that the Defendant engaged in price fixing and terminated the Plaintiff as one of its dealers in furtherance of a price fixing conspir-

acy, in violation of 15 U.S.C. § 1. The case is before the court on a Motion for Summary Judgment (Doc. # 12) filed by the Defendant, Rose America Corporation, d/b/a BMB ("BMB"), on August 23, 1999. Also before this court is Defendant's Motion to Preclude Plaintiff from Presenting Damages Evidence (Doc. # 31) filed on November 12, 1999.

On September 17, 1999, the Plaintiff, Jeffers Vet Supply, Inc. ("Jeffers Vet") requested an extension of time to respond to the Motion for Summary Judgment so that it could take additional depositions, including depositions of other dealers. The court granted the request and extended the response time to November 5, 1999. No further extension was requested. The court has considered all evidence submitted, and oral argument was heard in this case on November 18, 1999.

For the reasons to be discussed, BMB's Motion for Summary Judgment is due to be GRANTED.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is generally proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a gen-uine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See id.* at 322–24, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

The Eleventh Circuit has modified this summary judgment standard for "antitrust violations arising out of allegations that a distributor was terminated because it failed to adhere to an illegal resale price agreement." *See Helicopter Support Systems, Inc. v. Hughes Helicopter, Inc.,* 818 F.2d 1530, 1532 (11th Cir.1987). The modifications will be discussed below.

## III. FACTS

The submissions of the parties establish the following facts:

Jeffers Vet is a distributor of animal care supplies, with stores in Dothan, Alabama, and West Plains, Missouri. BMB is a division of Rose America Corporation and manufactures equine products. Among the products that BMB sells are horse blankets and sheets. In fact, BMB's total revenues for 1998 totaled $7,864,372, of which $3,783,501 was from the sale of horse blankets and sheets. *See* Barnhard Aff.

On or about February 12, 1996, Jeffers Vet became an authorized dealer of BMB. BMB would sell horse blankets and sheets at wholesale price to Jeffers Vet, which in turn sold these products to its customers through its catalogs and at its stores.

On June 1, 1998, BMB sent a letter to all of its dealers outlining a new pricing policy BMB was implementing. Jeffers Vet received the letter. The letter stated in pertinent part:

> As of October 1, 1998 our policy will be to terminate the dealer status of any dealer who sells or offers to sell BMB brand products at a price less than 90% of the retail prices established, and as modified from time to time, in our catalog. Our decision in this regard is completely unilateral and nonnegotiable. BMB does not seek either your approval or your agreement or other assurance of compliance. In the event of your failure to comply, you will simply be terminated as one of our dealers. Please do not report to us about the pricing behavior of other dealers. We have adopted this policy to maintain the brand integrity of BMB.

Pl.Br. Letter Exh. 2.

Jeffers Vet issued its fall catalog containing prices for BMB horse blankets and sheets in August of 1998. The prices in the catalog did not conform with BMB's new price policy. On or about October 16, 1998, BMB notified Jeffers Vet that it was terminating Jeffers Vet's dealership. The letter succinctly stated: "For failure to comply with our pricing policies, which we have unilaterally established, we regret to inform you that we are terminating your dealership." Pl.Br. Letter Exh. 9.

As a result of this termination letter, Dr. Keith Jeffers, the president of Jeffers Vet, called BMB in an attempt to "work out something." Jeffers Depo., p. 52, line 17–18. Then, in November of 1998, Jeffers Vet had its counsel send a letter to BMB demanding to be reinstated as a BMB dealer. BMB has refused to reinstate Jeffers Vet as a dealer. Jeffers Vet has had to find another wholesaler from which to purchase horse blankets and sheets.

Jeffers Vet has filed a Complaint alleging that BMB has engaged in price fixing, a *per se* violation of 15 U.S.C. § 1. *See* Complaint ¶ 8. Jeffers Vet further alleges that "BMB's termination of Jeffers [Vet] in furtherance of a price-fixing conspiracy is a *per se* violation of 15 U.S.C. § 1." Complaint ¶ 10.

## IV. DISCUSSION

Section 1 of the Sherman Antitrust Act ("Sherman Act") states, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1 (1997). In 1919, however, the Supreme Court, in the case of *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, held that the Sherman Act "[did] not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell." *Colgate*, 250 U.S. at 307, 39 S.Ct. 465. Case law over the years has developed a fine line between permissible manufacturer dealing

and illegal pricing activity. The present case illustrates permissible contact between manufacturers and dealers under *Colgate*.

## A. The Modified Summary Judgment Standard

■ According to the Eleventh Circuit, summary judgment in cases claiming "antitrust violations arising out of allegations that a distributor was terminated because it failed to adhere to an illegal resale price agreement" requires a modified standard. *Helicopter Support Systems, Inc. v. Hughes Helicopter, Inc.*, 818 F.2d 1530, 1532 (11th Cir.1987) ("*Helicopter* "). The Eleventh Circuit, in the *Helicopter* case, incorporated the Supreme Court holdings of *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and created what is known as the "*Helicopter* test" for summary judgment. This test was followed in the *De-Long Equipment Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1508–09 (11th Cir.1989) ("The summary judgment standard in vertical restraint cases is more stringent than in other areas of antitrust law because a higher possibility of capturing and invalidating legitimate business conduct exists."), and has remained the test used to analyze summary judgment in manufacturer and dealer claims under § 1 of the Sherman Act in the Eleventh Circuit.

The issues of material fact which must exist in order to survive summary judgment are whether a conspiracy to fix prices existed and whether the dealer was terminated pursuant to that conspiracy. *DeLong*, 887 F.2d at 1508.

According to the *Helicopter* test, in order to establish that such fact issues exist

the plaintiff must (a) "satisfy the court that the conspiracy which he alleges is, objectively, an economically reasonable one" and (b) produce "evidence which tends to exclude the possibility that the manufacturer was operating independently in making his determination to terminate the distributor." *Helicopter*, 818 F.2d at 1534. The Supreme Court had stated earlier that to prove an agreement to restrain trade in a dealer termination case the plaintiff must produce "direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 768, 104 S.Ct. 1464.

The first prong of the *Helicopter* test does not require much discussion.[1] In the present case it is economically reasonable to exclude dealers who sell at lower prices than recommended. BMB, as stated in its pricing letter, wanted to maintain brand integrity by keeping prices at a specific level. *See* Pl.Br. Letter Exh. 2. If customers recognize BMB as a quality brand, they will be willing to pay more for the product. Thus, it would be economically reasonable for BMB to conspire with its other dealers to keep low price selling dealers out of the BMB product market.

The second prong of the *Helicopter* test requires a deeper analysis. In order for Jeffers Vet to survive a summary judgment motion, Jeffers Vet must produce "evidence that tends to exclude the possibility" that BMB was acting independently. *See Helicopter*, 818 F.2d at 1534. Under the *Helicopter* test, there are two things that Jeffers Vet needs to show to exclude the possibility that BMB was acting independently: (1) BMB sought an agreement from its dealers to adhere to a resale price, and (2) the dealers communicated their acceptance of BMB's proposed

---

1. The court notes that neither party even addresses this prong of the test in brief. At oral argument, the Defendant argued that there were too many dealers to make an agreement possible or economically reasonable.

agreement. *See Helicopter*, 818 F.2d at 1533. In order to fully discuss the agreement requirements of the second prong of the *Helicopter* test, the court must address the *Colgate* case and its progeny.

## B. Colgate and its Progeny

■ *Colgate* was the first case that illustrated legal activity for a manufacturer to engage in when setting a pricing policy. *See United States v. Colgate*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).[2] In *Colgate*, the plaintiff alleged that the defendant manufacturer "knowingly and unlawfully created and engaged in a combination with ... wholesale and retail dealers ... for the purpose and with the effect of procuring adherence on the part of such dealers ... to resale prices fixed by the defendant...." *Id.* at 302, 39 S.Ct. 465. There was a list of acts allegedly performed by the defendant in order to carry out the conspiracy, among which were "[d]istribution among dealers of letters, telegrams, circulars and lists showing uniform prices to be charged; ... uniform refusals to sell to any who failed to give the [assurances to adhere to prices]...." *Id.* at 303, 39 S.Ct. 465. The Court found that there was no allegation that the manufacturer did anything other than refuse to deal with dealers who would not resell at a specified price. *See id.* at 305, 39 S.Ct. 465. Ultimately, the Court held that the Sherman Act did not restrict the right of a manufacturer to freely choose which parties it would deal with and that a manufacturer could announce in advance the circumstances under which it intended to deal. *See id.* at 307, 39 S.Ct. 465. The *Colgate* doctrine remains good law today.[3]

BMB denies that there was any conspiracy and argues that it acted independently when it established its price policy. *See* Def.Br. at 11–16. According to BMB, the letter it sent out on June 1, 1998, detailing its new pricing policy, complied with the *Colgate* holding and its progeny. *See* Def. Br. at 11 & Pl.Br. Letter Exh. 2. BMB argues that the letter merely announced the prices that would be effective October 1, 1998, and "set forth the circumstances (failure to follow pricing policy) which would result in dealer termination." Def. Br. at 11. BMB also alleges that the letter clearly indicated that its new policy was "completely unilateral" and that no approval, agreement or assurance of compliance were sought from its dealers. *See* Pl.Br. Letter Exh. 2. BMB notes that because it did not seek assurance of compliance with its new price policy, as the de-

**2.** Prior to *Colgate*, the leading case on price maintenance was *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). *Dr. Miles* held that minimum resale price maintenance was per se unlawful. *See id.* In *Dr. Miles*, the court was concerned that price maintenance restricted "the freedom of trade on the part of dealers who own what they sell." *Id.* at 407–08, 31 S.Ct. 376.

**3.** The Supreme Court has frequently narrowed the *Colgate* doctrine, but has never overruled the precedent. *See, e.g., Continental T.V., Inc. v. GTE Sylvania*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (White, J., concurring); *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Simpson v. Union, Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); *Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505; *FTC v. Simplicity Pattern Co.*, 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959); *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852 (1940); *FTC v. Beech-Nut Packing Co.*, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922); *Frey & Son v. Cudahy Packing Co.*, 256 U.S. 208, 41 S.Ct. 451, 65 L.Ed. 892 (1921); *United States v. A. Schrader's Son, Inc.*, 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471 (1920). Despite this narrowing, many courts believe that the *Monsanto* case revitalized *Colgate*.

fendant did in *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), its actions remained unilateral.[4] *See id.* At oral argument, Jeffers Vet conceded that the letter itself sent out on June 1, announcing the pricing policy complied with the *Colgate* requirements.

The court finds that the letter sent out by BMB on June 1 closely tracked the language of the *Colgate* doctrine. The letter, therefore, standing alone is not a violation of the Sherman Act. Consequently, the court must turn its attention to the other evidence submitted by Jeffers Vet alleging an agreement between BMB and its dealers. Jeffers relies primarily on two other types of evidence to support its theory that BMB's implementation of its pricing policy violated the *Colgate* doctrine and the Sherman Act. The first type of evidence is the customer contact logs and the deposition testimony that William "Barney" Barnhard ("Barnhard") and Ruth Bush ("Bush") helped calculate the prices for some dealers. The second type of evidence is evidence indicating that BMB did not terminate all dealers who did not comply with its pricing policy.

Jeffers Vet submitted customer reply logs to evidence BMB's policy of discussing the operation and enforcement of its pricing policy. *See* Pl.Br.Exh. A & Pl. Supp.Br.Exh. C. These customer contact logs are records of when a dealer called in with a question or complaint about the pricing policy set out by BMB. *See generally* Pl.Supp.Br.Exh. C. Also included with these contact sheets is a document entitled "Price Policy Calls." *See id.* This document is undated but instructs employees to "fill out a blue sheet" customer contact log when a customer calls regarding the "new pricing policy." *Id.* Employees were instructed to allow dealers to complain about the policy, but to say, "My role is to listen to your concerns and pass them on. But, I can't debate the policy with you." *Id.* Employees were also instructed to notify Bush or Barnhard if a dealer wanted someone to call them back about the pricing policy. *See id.* Jeffers Vet argues that these customer contact logs illustrate that "BMB was engaged in an illegal price maintenance scheme" when BMB contacted the dealers. *See* Pl.Br. at 7.

Further, the focus of Jeffers Vet's additional discovery was on whether or not BMB had a policy of discussing its pricing policy with its dealers. Barnhard testified at his deposition that he "felt like that [BMB] would be able to clarify for a dealer the computational method that would be used to determine the 90 percent." Barnhard Depo. at 57. Bush also testified that she would clarify prices with dealers in relation to the math required to calculate the prices. *See* Bush Depo. at 33, 49, 50, 51, 58, 59. In fact, Bush "clarified" the "90 percent calculation" with several dealers.

4. *Parke Davis* involves an action against a drug manufacturer alleging that the drug manufacturer conspired with retail and wholesale druggists to maintain wholesale and retail prices of the manufacturer's pharmaceutical products. Parke Davis would send out a catalog with a "Net Price Selling Schedule" listing suggested minimum resale prices. *Parke Davis*, 362 U.S. at 32, 80 S.Ct. 503. The catalog also stated that it was Parke Davis' "continuing policy to deal only with drug wholesalers who observed that schedule...." *Id.* The government argued that Parke Davis by "entwining the wholesalers and retailers in a program to promote general compliance with its price maintenance policy went beyond mere customer selection and created combinations ... to enforce resale price maintenance...." *Id.* at 37–38, 80 S.Ct. 503. The court found that the Parke Davis program "clearly exceeded the limitations of the Colgate doctrine...." *Id.* at 45, 80 S.Ct. 503. Parke Davis used the "refusal to deal with the wholesalers in order to elicit their willingness to deny Parke Davis products to retailers and thereby gain the retailers' adherence to its suggested minimum retail prices." *Id.* Parke Davis also violated the *Colgate* doctrine by discussing the policy with its wholesalers and retailers before implementing it. *Id.* at 46, 80 S.Ct. 503.

*See id.* She stated that, "We'd have our calculators out and we would calculate it." Bush Depo. at 149. According to Jeffers Vet at oral argument, these contacts with dealers to help them calculate their prices are a per se violation of the Sherman Act.

Citing to the *Monsanto* case, BMB argues that evidence that BMB sought agreement from its dealers as to the new prices has not been produced. *See* Def.Br. at 12. BMB alleges that the pricing letter specifically illustrated that no assurances of agreement were ever sought. *See id.* BMB avers that Jeffers Vet has "admitted that it has no evidence of what communications, if any, existed between BMB and its non-terminated dealers." Def.Br. at 14. BMB points out that even after the extended discovery period granted by this court, no dealers were deposed and no dealers submitted affidavits saying they discussed the pricing policy with BMB. *See* Oral Argument.

BMB further argues that its dealings with Jeffers Vet illustrate its unwillingness to discuss its pricing policy. When Dr. Jeffers contacted BMB after Jeffers Vet was terminated Barney Barnhard refused to discuss the pricing policy and refused to reinstate Jeffers Vet as a dealer. *See* Def.Br. at 12. This refusal to discuss the policy, according to BMB, is precisely what *Colgate* dictates. BMB argued that if it complied with Jeffers Vet's demands it would then have been in violation of the Sherman Act.

Moreover, after the extended discovery period, BMB argues that all of the new depositions only strengthen its argument that BMB has not violated the Sherman Act. *See* Def.Supp.Br. at 1. According to the deposition of Barnhard, the pricing policy "centered on methods to maintain [BMB's] brand integrity and create value in the customer's mind for the BMB brand." *See* Barnhard Depo. at 17. Barnhard testified that he had no conversation

with dealers prior to or after implementation of the pricing policy about the policy itself. *See id.* at 48. Ruth Bush, the Vice President of Sales for Rose America, stated in her deposition that she told dealers who wanted to discuss the pricing policy that, "I could not discuss it." Bush Depo. at 148–49. Finally, Kim Walker, Director of Customer Services, noted that BMB employees were "directed that they 'can't debate' and 'cannot discuss' the retail pricing policy with dealers." Def.Supp.Br. at 5 (citing Walker Depo. at 13).

The *Monsanto* court addresses the question of how much contact a manufacturer could have with its dealers in light of the *Colgate* doctrine. In *Monsanto*, a distributor of agricultural herbicides, Spray–Rite, brought suit against the manufacturer, Monsanto, alleging an antitrust violation after Spray–Rite was terminated. *See Monsanto*, 465 U.S. at 755–56, 104 S.Ct. 1464. Other distributors were complaining about Spray–Rite's price-cutting practices. *See id.* at 758–59, 104 S.Ct. 1464. There was also some testimony that indicated Monsanto officials terminated Spray–Rite because of price complaints. *See id.* at 759, 104 S.Ct. 1464. Moreover, there was testimony from a Monsanto district manager that Monsanto told price-cutting distributors that if they did not maintain the suggested resale price, "they would not receive adequate supplies of Monsanto's new corn herbicide." *Id.* at 765, 104 S.Ct. 1464. There was also evidence of a newsletter that discusses Monsanto's pricing and assured distributors that outlets would not sell the Monsanto products for less than the suggested retail price. *See id.* at 766, 104 S.Ct. 1464. The Court found that it was "reasonable to interpret this newsletter as referring to an agreement or understanding that distributors and retailers would maintain prices...." *Id.*

The Court in *Monsanto* reaffirmed the holding of *Colgate*: "Under *Colgate*, the manufacturer can announce its resale

prices in advance and refuse to deal with those who fail to comply. And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination." *Id.* at 761, 104 S.Ct. 1464. The Court did not find the evidence of complaints from other distributors of no probative value, but rather found that the burden was on the plaintiff to produce "additional evidence sufficient to support a finding of an unlawful contract, combination, or conspiracy." *Id.* at 764 n. 8, 104 S.Ct. 1464. The Court stated that some contact between manufacturer and dealer had to be allowed: "To bar a manufacturer from acting solely because the information upon which it acts originated as a price complaint would create an irrational dislocation in the market." *Id.* at 764, 104 S.Ct. 1464.

In the present case, Jeffers Vet submits the contact logs and the deposition testimony concerning the calculation of the prices for dealers as a per se violation of § 1 of the Sherman Act. Jeffers Vet does not cite any law to support its proposition that such contact was in violation of the *Colgate* doctrine and the court finds none. In fact, the *Monsanto* case illustrates that there can be some contact between a manufacturer and a dealer without violating the Colgate doctrine. *See Monsanto,* 465 U.S. at 764–65, 104 S.Ct. 1464. The Court says, "In order to assure an efficient distribution system, manufacturers and distributors constantly must coordinate their activities to assure that their product will reach the consumer persuasively and efficiently." *Id.* BMB was not going beyond a mere announcement and refusal to deal, as proscribed by *Colgate,* when it answered dealer questions concerning the specific calculation of prices in order to comply with the pricing policy. BMB's actions fall within *Monsanto's* acceptable communications between manufacturers and dealers.

The Eleventh Circuit embraced the *Colgate* and *Monsanto* line of cases in *Heli-*

*copter.* In *Helicopter,* Hughes manufactured helicopters and helicopter parts. *See Helicopter,* 818 F.2d at 1531. HSS was a franchised Hughes service center, often providing support services for Hughes helicopters at a significant discount. *See* id. HHS argues it was terminated as a Hughes distributor "because it undersold other Hughes distributors in the sale of Hughes parts overseas." *Id.* at 1532. HHS brought a § 1 Sherman Act claim against Hughes for allegedly engaging in a price fixing conspiracy. *See* id.

As discussed above, the Eleventh Circuit applied a "revised standard of proof" for summary judgment in this case. *Id.* Among the evidence reviewed by the district court was a series of communications from an overseas distributor. *See id.* at 1535. The Eleventh Circuit found that these communications could be read as more than complaints. Other evidence included Hughes' international distributorship agreement which said amendments to the "suggested price lists ... will be binding on Distributor upon notification in writing." *Id.* at 1536. Further, there was evidence of threats of termination, a direct request by Hughes to HHS to stop its discounting tactics, and evidence that Hughes retaliated against HHS by franchising another service center in Florida. *See id.* at 1536 n. 10. The court found this evidence convincing of a "conscious commitment to a common scheme to achieve an unlawful objective." *Id.* at 1535. Accordingly, the court held that "HHS has both alleged an economically reasonable conspiracy, and adduced evidence which tends to exclude the possibility that Hughes was acting independently." *Id.* at 1534.

The present case is distinguishable from *Helicopter* because there is no evidence of a "conscious commitment" to a common scheme. Unlike in Helicopter, in the present case there is no evidence of continued communications between BMB and its

dealers about the pricing policy or others violating the pricing policy. In fact, no evidence that other dealers discussed the pricing policy with BMB prior to the enactment of the policy has been submitted to the court. Fewer than ten customer call sheets have been submitted, out of over 1000 dealers, where dealers even called with questions about the pricing policy after it was enacted. *See* Supp.Pl. Br.Exh. D, G, & H. The depositions illustrate that BMB employees' were only willing to explain to the dealers how to calculate prices to conform to the pricing policy. Thus, the court finds that this evidence of dealer contact does not "tend to exclude the possibility" that BMB was "operating independently" as required by the *Helicopter* standard.

Jeffers Vet also argues that BMB has violated the Sherman Act because BMB did not follow its pricing policy with every dealer. Jeffers Vet argues that at least one document shows that dealers were reporting other non-conforming BMB dealers to BMB (see Pl.Supp.2 Br.Exh. J) and that BMB was not uniformly enforcing its pricing policy. For example, Jeffers Vet alleges that Offut's West, another BMB dealer, notified BMB that it would be selling some BMB products below the 90% requirement at a Christmas sale. *See* Pl. Supp.2 Br. at 8. Offut's West has not been terminated as a dealer. *See id.*

BMB conceded at oral argument that it was notified of the Christmas sale held by Offut's West, where BMB products were sold below the prices permitted by the pricing policy. BMB also conceded that Offut's West was not terminated as a dealer. BMB argued, however, that BMB's dealing with Offut's West has no impact on whether BMB violated the Sherman Act. According to BMB, BMB not following its pricing policy in one instance with one dealer does not evidence a Section 1 violation of the Sherman Act.

The court agrees with BMB. The evidence that Jeffers Vet has submitted to

illustrate that BMB did not enforce its pricing policy does not "tend[ ] to exclude the possibility" that BMB and Offut's West were "acting independently." Evidence that BMB did not follow its pricing policy in the one instance of Offut's West's Christmas sale does not suggest a price fixing agreement between BMB and its dealers. Section 1 of the Sherman Act was enacted to prevent concerted action from unreasonably restraining trade. *See* ABA Section of Antitrust Law, Antitrust Law Developments 3 (4th ed.1997). By not complying with its pricing policy, BMB cannot have a "conscious commitment to a common scheme" to fix prices. *Cf. Alliance Shippers v. Southern Pac. Transp. Co.*, 858 F.2d 567, 570 (9th Cir.1988) (noting that vertical arrangements resulting in price discrimination are not per se violations); *Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 375 (3d Cir.1985) ("Moreover, that a manufacturer may give preferential pricing and delivery terms to one distributor does not establish a per se violation of the section 1 of the Sherman Act even though other distributors suffer losses in sales."). In other words, by not holding Offut's West to the prices set out by BMB, BMB cannot be said to be unlawfully maintaining its resale prices.

### C. Coercion

Jeffers Vet argues that it can establish that BMB engaged in an illegal pricing scheme because BMB used coercive means to force dealers to comply with the suggested pricing. *See* Pl.Br. at 8. First, Jeffers Vet cites to *Belk–Avery, Inc. v. Henry I. Siegel Co.*, 457 F.Supp. 1330, 1334 (M.D.Ala.1978), to argue that a dealer must agree to the prices set by the manufacturer through free choice, prompted only the desirability of the product. Quoting from *Carlson Machine Tools, Inc. v. American Tool*, 678 F.2d 1253 (5th Cir. 1982), Jeffers Vet alleges: "Resale price maintenance occurs, 'when a price is an-

nounced and some course of action is undertaken or threatened contingent on the willingness or unwillingness of the retailer to adopt the price ... [resale price maintenance] must involve making a meaningful event depend on compliance or non-compliance with the 'suggested' or stated price'." *Carlson*, 678 F.2d at 1261. Jeffers Vet submits the letter from BMB to all of its dealers on June 1, stating, "In the event of your failure to comply ..., you will be terminated as one of our dealers." *Id.* According to Jeffers Vet, the impending termination for failure to comply with the October price list "makes it unlikely that dealers were prompted solely by a desire to market BMB products when they followed BMB's suggested retail prices." *Id.*

Jeffers Vet's reliance on *Belk–Avery* and *Carlson* is misplaced. The proposition that Jeffers Vet relies on from *Belk–Avery* is a true statement. However, in the present case there is no coercion. Dealers must decide whether they want BMB products and if they do they must conform to BMB's pricing policy.[5] The threatened action referred to by the *Carlson* court is to action by the manufacturer after it has agreed to deal with a dealer. *Carlson* says that a manufacturer's threats of termination and other coercive actions taken *after* a dealer fails to conform to the manufacturer's predetermined prices are "other means" and therefore the actions are in violation of the Sherman Act. *Carlson*, 678 F.2d at 1261. In the present case, BMB announced its terms of dealing before it implemented the price policy.[6] Another Georgia court agrees with *Carlson*. *See Ben Sheftall Distributing Co., Inc. v. Mir-*

ta de Perales, Inc., 791 F.Supp. 1575 (S.D.Ga.1992). This court found: "Where the actions involved are announcement and termination; monitoring of dealer performance through one's own employees or otherwise; or the use of third parties-to carry the message or to contact customers or replacement dealers-to effect a termination, no agreement is shown." *Id.* at 1583. Consequently, the court finds Jeffers Vet's arguments unpersuasive and finds that the evidence cannot establish that BMB illegally coerced its dealers into compliance with its announced pricing.

## V. CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgement is due to be GRANTED. There is simply no evidence before the court from which a reasonable jury could conclude the BMB illegally fixed prices through a conspiracy with dealers and that it terminated Jeffers Vet as a dealer in furtherance of such a conspiracy. The Defendant's Motion to Preclude Plaintiff from Presenting Damages Evidence is due to be DENIED as MOOT.[7] A separate order will be entered in accordance with this memorandum opinion.

### ORDER AND JUDGMENT

In accordance with the Memorandum Opinion entered on this day, it is hereby ORDERED as follows:

1. Defendant's Motion for Summary Judgment (Doc. # 12) is GRANTED.

2. Defendant's Motion to Preclude Plaintiff from Presenting Damages Evidence (Doc. # 31) is DENIED as MOOT.

---

5. Citing *Belk–Avery* for any other proposition in this case would be fruitless as *Belk–Avery* is so factually dissimilar from the present case.

6. The court notes that even in *Carlson* the court did not determine that the activity of the manufacturer rose to the level of illegal activity. The court found that the dispute between the parties was not related to the pricing policy. *See Carlson*, 678 F.2d at 1261.

7. Because Defendant's Motion for Summary Judgment is due to be granted, no trial will be held in this case. Consequently, the Defendant's Motion to preclude Damages Evidence at trial is MOOT.

3. Judgment is entered in favor of the Defendant, Rose America Corp., d/b/a BMB, a division of Rose America Corporation, and against the Plaintiff, Jeffers Vet Supply, Inc.

4. Costs are taxed against the Plaintiff.